1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO BAYKEEPER,

      Plaintiff,

  v.

LEVIN ENTERPRISES, INC. et al.,

      Defendants.
_____/

No. C -12-04338(EDL)

**ORDER GRANTING IN PART AND
DENYING IN PART THE PARTIES'
CROSS-MOTIONS FOR SUMMARY
ADJUDICATION**

**I.      Introduction**

      This case arises under the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 et seq.  Plaintiff
San Francisco Baykeeper, an environmental advocacy group, alleges that Defendants Levin
Enterprises, Inc. ("LEI"), and Levin-Richmond Terminal Corporation ("LRTC"), which operate a
marine bulk terminal ("the Levin Facility") on the Lauritzen Canal and the Santa Fe Channel of San
Francisco Bay, have violated the CWA and their permit to discharge storm water under the National
Pollutant Discharge Elimination System ("NPDES").  Plaintiff has moved for partial summary
judgment on two of Defendants' affirmative defenses.  Plaintiff argues that its notice-of-intent-to-
sue letter was adequate, and that Defendants must have – and do have – permit coverage for all their
activities at the terminal.  Defendants filed a cross-motion for summary judgment as to all of
Plaintiff's claims based on the inadequacy of the notice of intent to sue, and for summary judgment
as to most of Plaintiff's claims based on their contention that no permit is required for most of the
activities at the Levin Facility.  The Court grants in part and denies in part both motions for
summary judgment.

**United States District Court**
For the Northern District of California

**II.     Background**

   **A.     Regulatory Background**

        **1.     Clean Water Act**

   The goal of the Clean Water Act is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Section 310(a) of the CWA prohibits the discharge of pollutants from any point source into waterways without an NPDES permit. 33 U.S.C. § 1311(a). The CWA defines "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

   Congress established the permitting process for storm water discharge in 1987. Most discharges composed entirely of storm water are exempt from the CWA's permitting requirements, but permits are required for discharges associated with "industrial activity." See 33 U.S.C. § 1342(p)(1) and (2); Natural Res. Def. Council, Inc. v. EPA, 966 F.2d 1292, 1304-05 (9th Cir. 1992) (detailing EPA's regulations regarding "industrial activity" sources). EPA's implementing regulations at 40 C.F.R. § 122.26 require NPDES permit authorization for facilities engaged in industrial activity to discharge to United States waters.

   There are eleven categories of facilities engaged in industrial activity, grouped according to Standard Industrial Classification ("SIC") codes. See 40 C.F.R. § 122.26.(b)(14). Marine transportation facilities, such as the one at issue in this case, are SIC code 4491; industrial activities at transportation facilities are defined as the portions of the facility involved in vehicle maintenance, equipment cleaning, or airport deicing operations. Id.

        **2.     California's Permit for Industrial Dischargers**

   In 1973, the EPA delegated its authority to operate the NPDES program to the State of California. See 57 Fed. Reg. 43,733, 43-743-35 (listing states with permitting authority). The State

2

**United States District Court**
For the Northern District of California

1    Water Board is a delegated agency and is authorized to issue, implement, and enforce NPDES

2    permits.  See Cal. Water Code § 13160.  This authority includes implementation and enforcement of

3    the Permit and exercise of residual authority pursuant to 33 U.S.C. § 1342(p)(2)(E), which provides

4    that a delegated state may determine that a storm water discharge contributing to a violation of a

5    water quality standard, or that is a significant contributor of pollutants to United States waters,

6    requires an NPDES permit.  See 57 Fed. Reg. 43,733, 43-743-35.

7         The State Board issued a single statewide permit ("Permit" or "General Permit") for

8    industrial discharges in 1991.  See Declaration of Caroline Koch ISO Pl.'s MSJ ("Koch Decl. ") Ex.

9    E at II.  The Permit was modified in 1992 and reissued in 1997.  Id.  To lawfully discharge storm

10   water in California, facilities engaged in certain industrial activity must comply with the terms of the

11   Permit.  33 U.S.C. § 1342(p)(2)(B); see also Koch Decl. 1 Ex. E at 1 (listing regulated discharges).

12   Facilities seeking coverage under the General Permit must submit a Notice of Intent to Comply with

13   the General Permit ("NOI").  Id. Ex. E at 6.  The NOI embodies the discharger's agreement to abide

14   by the terms of the permit.  Envt'l Def. Ctr., Inc. v. EPA, 344 F.3d 832, 853 (9th Cir. 2003).

15        The Permit has four basic requirements.  First, permittees must implement best management

16   practices ("BMPs") to reduce or prevent pollutants in storm water discharges.  Second, the Permit

17   forbids discharges of storm water that cause or contribute to an exceedance of applicable Water

18   Quality Standards in the applicable water quality or basin plan.  Third, permittees must develop and

19   implement a Storm Water Pollution Prevention Plan ("SWPPP").  Fourth, permittees must develop

20   and implement a Monitoring and Reporting Program ("M&RP") in compliance with Section B of the

21   Permit, which includes filing annual reports with the Regional Water Quality Control Board.  Koch

22   Decl. 1 Ex. E at 4, 11-23, 24-45.

23

24        **B.      Factual and Procedural History of Defendants' Permits**

25             **1.      The LRTC Permits**

26

27        Defendant LRTC owns the Levin Facility, a dry bulk cargo marine terminal in Richmond,

28   California, on the Inner Harbor of San Pablo Bay.  Defs.' MSJ Br. at 8.  (Plaintiff states that

**United States District Court**
For the Northern District of California

Defendant Levin Enterprises, Inc., is the owner of the Main Terminal and the North Parr Yard portions of the Levin Facility, and that the South Parr yard is owned by the 799 Wright Avenue LLC, whose sole owner is Defendant Levin Enterprises, Inc.  Koch Decl. 1 ¶ 25, Ex. U (Excerpts from Defendants' Responses to Requests for Admission) at 5-10.)  It accepts dry bulk cargo from customers via truck or rail and loads the cargo into ships.  There are facilities to temporarily store cargo before loading and two berths for cargo ships.  Most of the cargo is stored outside.  Defs.' Br. at 8; Declaration of James Holland ISO Defs.' Cross-Motion for Summary Judgment ("Holland Decl.") ¶¶ 6-8.  Defendant LRTC has an air permit from the Bay Area Air Quality Management District ("BAAQMD") for the storage and handing of dry bulk cargo and its associated equipment (e.g., the bulk transport system).  Holland Decl. Ex. B.

In 1992, Defendants submitted a "Notice of Intent for General Permit to Discharge Stormwater Associated with Industrial Activity" to the State Board.  Koch Decl. 1 Ex. G at 2.  Levin Enterprises is listed as the Owner/Operator, and the Levin Facility is described as a marine bulk terminal with an SIC code of 4491.  Id.  Under "Industrial Activities at Facility," three activities are checked: material storage, vehicle maintenance, and material handling.  Id.  Under "Types of materials handled and/or stored outdoors," scrap metal and "Other: Materials loaded/unloaded ie: Bauxite, Coal, Green Coke, Hog Fuel, Aggregate, etc." are checked.  Id. at 3.  The Facility is listed as approximately 43 acres.  Id.

In 1997, the General Permit expired.  Those facilities enrolled under the prior Permit were sent NOI certifications and instructed that to enroll under the new General Permit, they should sign the certification and return it to the State Board.  Koch Decl. 1 Ex. H at 2.  Defendant signed the certification and dated it May 25, 1998.  Id. at 3.  The certification states that "I certify that the provisions of the permit, including the development of and implementation of a Storm Water Pollution Prevention Plan and a Monitoring Program Plan, will be complied with."  Id.

Defendants submitted their first SWPPP and M&RP for the Levin Facility in June of 2003.  Koch Decl. 1 Exs. I, J.  They submitted further SWPPPs and M&RPs dated 2006-2007 and 2011-2012.  Id. Exs. O, P, Q.  The current SWPPP, from 2013, states that Defendants "elected to manage all of the stormwater runoff" at the Facility.  Id. Ex. S at 6.

**2.     Plaintiff's Notice-of-Intent-to-Sue Letter**

On June 5, 2012, Plaintiff wrote Defendants a letter ("Notice Letter") notifying them of Plaintiff's intent to file suit under the Clean Water Act.  First Amended Compl. ("FAC"), Docket No. 12, Ex. A.  The letter will be discussed in more detail below, but it is approximately 20 pages long, plus attachments, and describes Plaintiff's role as an advocacy organization, Defendants' operation, how storm water pollutes the San Francisco Bay watershed, how the Regional Board administers the General Permit, how Defendants' industrial activities pollute the Bay, and the specific alleged violations of the Clean Water Act.

**3.     Regional Board Communication Regarding LRTC's Permit Coverage**

On March 18, 2013, the Chief of the Regional Board's Watershed Division, Shin-Roei Lee, sent Defendants a letter stating that the Levin Facility "has had permit coverage" under the General Permit since 1992, and is required to maintain and implement a SWPPP.  Having reviewed Defendants' 2013 SWPPP and 2011-12 Annual Monitoring Report, Ms. Lee wrote:

> [W]e determine that the Terminal has been and must continue to be covered by the Permit due to the following reasons:
>
> 1) At the Terminal, dry bulk material storage and handling of materials . . . are conducted in a way that results in discharges of polluted storm water.
>
> 2) The Terminal lacks structural and non-structural controls necessary to prevent the discharge of pollutants associated with industrial activities at the Terminal.
>
> 3) Laboratory analyses of storm water samples taken from the site as reported in the 2011-2012 Annual Report show that storm water contains pollutants, including metals and suspended sediments above US EPA's benchmark values (see attached table).
>
> In summary, the Terminal is required to remain covered by and comply with the Permit.

Declaration of Shin-Roei Lee, Defendants' MSJ Brief ("Lee Decl."), Ex. A at 1-2.

On April 9, 2013, Defendants challenged Ms. Lee's letter, and on May 29, 2013, Yuri Won, the Regional Board's Senior Staff Counsel, responded:

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1
2
3
4

> It appears that the storage and handling of the coke piles, by itself, at the site is not identified in the statewide general industrial stormwater permit (General Permit) as requiring permit coverage.  Nonetheless, we understand that the Levin-Richmond Terminal has filed a Notice of Intent (NOI) to comply with the General Permit with respect to the coke piles.  As such, we expect the Levin-Richmond Terminal to comply with the General Permit as it pertains to the coke piles.

5  Lee Decl. Ex. B.  On May 2, 2013, Regional Board staff member Michelle Rembaum-Fox inspected

6  the Levin Facility and found violations of the General Permit, laid out in a June 11, 2013 Notice of

7  Violation letter from Ms. Lee.  Lee Decl. ¶ 7 & Ex. C ("NOV letter").

8  Defendants responded to the NOV letter on July 30, 2013.  Declaration of Catherine Johnson

9  ISO Defs.' MSJ ("Johnson Decl.") Ex. C.  In the response, Catherine Johnson, Defendants' counsel,

10  stated that

11
12

> LRTC has been managing its bulk material storage and handling activities as if these activities were regulated by the General Permit.  We have been doing so on a voluntary basis and hope to continue to so [sic].

13
14

> Based on our conversations with you, we understand that you concur that the bulk material handling and storage is not subject to the General Permit.  Nonetheless, you also take the position that LRTC must comply with the General Permit as to all activities identified in its Notice of Intent to Comply ("NOI"), including activities not subject to the General Permit, such as bulk material storage and handling. . . .

15
16

> LRTC wants to work cooperatively with the Regional Board.  We understand that a voluntary compliance on the magnitude assumed by LRTC is highly unusual if not unprecedented and leads to some confusion on all sides.

17  Johnson Decl. Ex. C at 1.  The letter also stated that Defendants believe that all of the issues raised

18  in the NOV had been resolved.  Id.

19  Ms. Lee, the Watershed Chief at the Regional Board, provided a declaration to Defendants

20  that is attached to their opening brief.  In it, she outlined her history with the Regional Board and her

21  credentials; she has been the Watershed Management Division Chief since November of 2003 and

22  supervises compliance assurance and enforcement efforts related to the Permit.  Lee Decl. ¶ 2.  Ms.

23  Lee states that "[t]he Regional Water Board has no position on the disposition of this lawsuit

24  between two private parties and provides this declaration for the purpose of clarifying certain

25  statements or positions that may be attributed to the Regional Water Board by the parties in this

26  case."  Id. ¶ 4.  After laying out the correspondence and inspection history, Ms. Lee states "[t]o date,

27  the Regional Water Board has taken no formal Board action adopting the position that LRTC must

28  continue to have Permit coverage for activities that are not subject to the General Permit."  Id. ¶ 8.

6

**United States District Court**
For the Northern District of California

1    She states further that "[t]he General Permit does not identify bulk material handling and storage

2    activities at transportation facilities as industrial activities that require a permit under the General

3    Permit." Id. ¶ 9. Finally, she states that "[t]o date, the Regional Water Board has taken no formal

4    Board action adopting the position that discharges from LRTC contribute to a violation of a water

5    quality standard or are a significant contributor of pollutants to waters of the United States under 40

6    CFR section 122.26(a)(1)(v)." Id. ¶ 10.

7

8    **III.    Legal Standard**

9        **A.    Summary Judgment**

10

11       Summary judgment shall be granted if "the pleadings, discovery and disclosure materials on

12   file, and any affidavits show that there is no genuine issue as to any material fact and that the

13   movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(c). Material facts are those

14   which may affect the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

15   (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury

16   to return a verdict for the nonmoving party. Id. The court must view the facts in the light most

17   favorable to the non-moving party and give it the benefit of all reasonable inferences to be drawn

18   from those facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The

19   court must not weigh the evidence or determine the truth of the matter, but only determine whether

20   there is a genuine issue for trial. Balint v. Carson City, 180 F.3d 1047, 1054 (9th Cir. 1999).

21       A party seeking summary judgment bears the initial burden of informing the court of the

22   basis for its motion, and of identifying those portions of the pleadings and discovery responses that

23   demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317,

24   323 (1986). Where the moving party will have the burden of proof at trial, it must affirmatively

25   demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue

26   where the nonmoving party will bear the burden of proof at trial, the moving party can prevail

27   merely by pointing out to the district court that there is an absence of evidence to support the

28   nonmoving party's case. Id. If the moving party meets its initial burden, the opposing party "may

1    not rely merely on allegations or denials in its own pleading;" rather, it must set forth "specific facts

2    showing a genuine issue for trial." See Fed. R. Civ. P. 56(e)(2); Anderson, 477 U.S. at 250.  If the

3    nonmoving party fails to show that there is a genuine issue for trial, "the moving party is entitled to

4    judgment as a matter of law." Celotex, 477 U.S. at 323.

6         **B.    Summary Adjudication**

8         The parties have asked that if the Court declines to grant summary judgment, it instead grant

9    summary adjudication under Federal Rule of Civil Procedure 56(g), which provides that a court

10    "may enter an order stating any material fact – including an item of damages or other relief – that is

11    not genuinely in dispute and treating the fact as established in the case." Fed. R. Civ. P. 56(g).

12    Summary adjudication may be appropriate on clearly defined issues. California Sportfishing

13    Protection Alliance v. Diablo Grande, Inc., 209 F. Supp. 2d 1059, 1065 (E.D. Cal. 2002) (citing

14    Robi v. Five Platters, Inc., 918 F.2d 1439 (9th Cir. 1990)).  It can be used to narrow issues while

15    allowing the court to retain its power to adjudicate all claims. Id.  Summary adjudication may be

16    used to dispose of affirmative defenses. Id.

18    **IV.    Argument**

20         There are two main questions at this stage of the case.  One is which activities at the Levin

21    Facility are covered by the General Permit.  The other is whether Plaintiff's Notice Letter was

22    sufficient.  Although these issues are somewhat intertwined, and because Plaintiff's arguments have

23    evolved over the course of briefing and oral argument, the Court will first address the scope of the

24    coverage of the General Permit, and then consider the sufficiency of Plaintiff's Notice Letter.

26         **A.    Scope of Permit Coverage**

28         The parties disagree about the most basic issue in the case:  whether the vast

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1   majority of Defendants' activities require General Permit coverage.  Most of the activities at the

2   Levin Facility consist of bulk handling and storage of the cargo that Defendants load onto ships.

3   Plaintiff argues that Defendants sought Permit coverage for all of their activities in 1992, including

4   bulk handling and storage.  Having taken advantage of the benefits of the Permit since then, Plaintiff

5   argues, Defendants are required to comply with the Permit's requirements.  Plaintiff also argues that

6   Defendants not only sought and received Permit coverage, but that they are required to have Permit

7   coverage for all of their activities.  Defendants state that they cannot possibly have sought coverage

8   for something that the Permit, by its very language, does not cover, and that they are being punished

9   for voluntarily managing their storm water discharges.

11          **1.      Whether the Permit, on its Face, Covers Bulk Material Handling and
                       Storage**

13          As discussed above in the Facts section, California has a General Permit for Discharges of

14   Storm Water Associated With Industrial Activities.  Koch Decl. Ex. E.  "Industrial activities" for a

15   transportation facility, including a marine terminal such as the Levin Facility, are vehicle

16   maintenance, equipment cleaning, and airport deicing.  See id. Ex. E at 69 ("Only those portions of

17   the facility involved in vehicle maintenance (including vehicle rehabilitation, mechanical repairs,

18   painting, fueling, and lubrication) or other operations identified herein that are associated with

19   industrial activity); see also 40 C.F.R. § 122.26(b)(14).  It is undisputed that Defendants conduct

20   vehicle maintenance and equipment cleaning at the Levin Facility.  It is also undisputed that any

21   activity beyond vehicle maintenance and equipment cleaning at a transportation facility does not

22   appear in the language of the regulation or the Permit.

23          Defendants filed a Notice of Intent to comply with the Permit in 1992, and it checked the

24   boxes under "Industrial Activities" for material storage, vehicle maintenance, and material handling.

25   Koch Decl. Ex. G at 1. The NOI form that Defendants filled out in 1992 is not specific to

26   transportation facilities.  There is a place to fill out which SIC ("Standard Industrial Classification")

27   Code covers the filer's facility; Defendants filled out 4491 for Marine Bulk Terminal.  The list of

28   boxes to be checked is not exclusive to a transportation facility.  The 1997 NOI is just over a page

1   and asks for no details of the facility, operation, or activities, but simply requests that the signer

2   "certify that the provisions of the permit, including the development of and implementation of a

3   Storm Water Pollution Prevention Plan and a Monitoring Program Plan, will be complied with."

4   Koch Decl. Ex. H at 2; see also Defs.' RFN, Docket No. 74, Ex. A at 76-77.

5       Although Plaintiff insists that there "is no dispute that Defendants sought, obtained, and

6   continue to have Permit coverage for the entirety of the Levin Facility.  Nor is there a reasonable

7   dispute that Defendants are required to have site-wide Permit coverage," Pl.'s Reply at 1, the

8   Regional Board's evolving position, and the language of the Permit itself, belie that argument.

9   Although Plaintiff is correct that an NOI is an agreement to abide by the terms of the Permit, see

10   Envtl. Def. Ctr. v. Envtl. Prot. Agency, 344 F.3D 832, 853 (9th Cir. 2003), the NOI binds its signer

11   to the terms of the Permit, not to some standard beyond those terms.  See Koch Decl. Ex. E (General

12   Permit) at VII ("Certification of the NOI signifies that the facility operator intends to comply with

13   the provisions of the General Permit.").  Plaintiff is also correct that the Court may determine the

14   scope of Defendants' required Permit coverage and should use principles of contract construction to

15   do so.  Northwest Envtl. Advocates v. City of Portland, 56 F.3d 979, 984-85 (9th Cir. 1995).

16   However, Plaintiff's statement that "the rules of contract construction dictate that unambiguous

17   language be applied as stated" does not lead to their conclusion that Defendant is liable for Permit

18   coverage.  Rather, the unambiguous language of the Permit provides that for a marine terminal such

19   as Defendants' facility, the Permit covers vehicle maintenance and equipment cleaning, not bulk

20   material handling and storage.

21       Plaintiff argues that Defendants could have sought to amend their NOI or terminate their

22   Permit coverage.  However, Defendants maintain that there was no need to amend their NOI or

23   terminate Permit coverage, because they are in compliance with the Permit's terms.  Defendants'

24   counsel Catherine Johnson's July 30, 2013 letter to the Regional Board raised the possibility that

25   LRTC might seek an alternate arrangement with the Regional Board, if its voluntary management of

26   storm water continued to be so contentious.  Johnson Decl. Ex. C.  While, with the benefit of

27   hindsight, Defendants could have taken a different course of action that might have led to less

28   confusion, Defendants are not required to clarify Permit coverage that they are not required to have

in the first place.  On its face, the General Permit does not require Defendants to have Permit

coverage for their bulk material storage and handling, but rather only for their vehicle maintenance

and equipment cleaning operations.

### 2.        Deference to the Regional Board and Delegation of Residual Authority

#### a.        The Evolution of the Regional Board's Opinion Regarding Permit Coverage

The Regional Board's staff has, in the past, insisted that the Defendants had and were

required to have Permit coverage for all of their activities, as detailed above.  However, Shin-Roei

Lee, the Chief of the Regional Board's Watershed Division, subsequently provided a declaration to

Defendants acknowledging the lack of any formal Regional Board position on this issue.

Specifically, she states that "[t]he Regional Water Board has no position on the disposition of this

lawsuit between two private parties and provides this declaration for the purpose of clarifying

certain statements or positions that may be attributed to the Regional Water Board by the parties in

this case." Lee Decl. ¶ 4.  She adds that "[t]o date, the Regional Water Board has taken no formal

Board action adopting the position that LRTC must continue to have Permit coverage for activities

that are not subject to the General Permit." Id. ¶ 8.  She states further that  "[t]he General Permit

does not identify bulk material handling and storage activities at transportation facilities as industrial

activities that require a permit under the General Permit." Id. ¶ 9.  Finally, she states that "[t]o date,

the Regional Water Board has taken no formal Board action adopting the position that discharges

from LRTC contribute to a violation of a water quality standard or are a significant contributor of

pollutants to waters of the United States under 40 CFR section 122.26(a)(1)(v)." Id. ¶ 10.

There has been an evolution from the position of the Regional Board in the March 18, 2013

letter (LRTC has had permit coverage for all activities since 1992 and must continue to have it) to

the May 29, 2013 letter (although the General Permit does not cover the storage and handling of the

coke piles, LRTC filed a NOI to comply with the General Permit as to those coke piles and needs to

remain in compliance) to the July 16, 2013 declaration (the General Permit does not cover bulk

material and handling at the Levin Facility, and it is not the position of the Regional Board that

United States District Court
For the Northern District of California

LRTC needs to have Permit coverage for activities not subject to the Permit).  This raises questions of how the Regional Board delegates its residual authority and which Regional Board opinion the Court should consider in interpreting the statute, regulations, and the Permit.

**b.**      **Delegation of Residual Authority**

Plaintiff argues that, even if the Permit on its face does not require coverage for all of Defendants' activities, the Regional Board may use its residual authority to decide that all of Defendants' activities require Permit coverage.  Defendants counter that the exercise of delegated residual authority is typically for ministerial functions, not major decisions like what kind of industrial activity is covered by the permit.

The CWA's regulations allow for the EPA Director or the administrator of an approved NPDES program to require permit coverage for a discharge that "contribute[s] to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States."  40 C.F.R. § 122.26(a)(1)(v) ("residual designation authority" or RDA).  California has nine Regional Water Quality Control Boards.  Cal. Water Code. §§ 13100, 13225.  The Regional Boards have appointed board members, an executive officer, and staff.  Cal Water Code. §§ 13201, 13220.  Plaintiff claims that most of the duties of the Regional Board's appointed board members may be delegated to the executive officer, and staff at the Boards frequently execute these delegated tasks, including issuing notices of violation, approving notices of termination, and exercising the residual authority to designate storm water discharges as requiring Permit coverage.  See Cal. Water Code §§ 13223(a), 13220(d); Supp. Koch Decl. Exs. C, F-G.  Where delegation to the executive officer is not permitted, the Water Code establishes a formal process.  For example, cease and desist orders (§ 13301), clean up and abatement orders (§ 13304), and administrative civil liability (§ 13323) all require a formal process.  Supp Koch Decl. Ex. H.  Plaintiff states that the Water Code does not establish a formal process for exercising the residual authority under 33 U.S.C. § 1342(p)(2)(E).

Defendants argue, persuasively, that Plaintiff has overstated the magnitude of decisions that may be delegated to a Regional Board's executive officer and on down to staff.  The sections of the

United States District Court

For the Northern District of California

12

**United States District Court**
For the Northern District of California

1   California Water Code cited by Plaintiff as showing broad authority are in fact quite specific.

2   Section 13223(a) allows an executive director of a Regional Board to issue a complaint for civil

3   liability – not to decide that an activity beyond the scope of the Permit triggers that liability.  Cal.

4   Water Code § 13223(a).  Section 13220(d) lays out the resolution process should a dispute arise

5   between different regional boards.  Cal. Water Code § 13220(d).   Neither section shows that the

6   staff of a regional board may decide that an activity not included in the Permit itself requires Permit

7   coverage.  While it may be true that the Water Code does not require a formal process to exercise the

8   residual authority, that does not mean that every major decision without a specific statutory section

9   devoted to it is simply up for determination by the staff of a Regional Board.

10          Defendants also point out that in 2011, Plaintiff urged the State Water Board to include all

11  areas of transportation facilities in the General Permit, not just those with fueling and maintenance

12  activities.  See Defs.' RFN Ex. C (4/29/11 Comment Letter) at 26 (noting that the draft Permit for

13  the relevant SIC codes governs transportation facilities if they have vehicle maintenance shops,

14  equipment cleaning operations, or airport deicing operations, and urging that "[a]ll transportation

15  facilities and all areas of such facilities should be included, not just those with fueling and

16  maintenance activities" because the facilities are "industrial in scale and involved in transporting

17  bulk materials that are still part of industrial activity rather than the sale of a finished product.").

18  The Regional Board's response to that comment was that "The Permit only covers discharges as

19  defined in the federal regulations.  Authority to add additional categories is limited to a formal

20  designation process."  Id. Ex. D (2011 Draft Industrial General Permit Response to Comments) at

21  Comment 1223.  This reference to a "formal designation process" being necessary to do exactly that

22  which Plaintiff wants to do here – include bulk handling and storage in the General Permit –

23  effectively counters Plaintiff's argument that the Regional Board's staff can informally exercise its

24  residual authority to make a designation of this magnitude.

25          Further, it does not appear that the Regional Board has tried to exercise this authority,

26  regardless of whether the regulation allows such an exercise without a formal process.  In Shin-Roei

27  Lee's declaration supporting Defendants' cross-motion, she states that the Regional Board takes no

28  position on the lawsuit, that the Board has taken no formal action adopting the position that LRTC

**United States District Court**
For the Northern District of California

1   needs Permit coverage for activities that are not subject to the General Permit, that the Permit does

2   not identify bulk material handling and storage activities at transportation facilities as requiring

3   coverage, and that "the Regional Water Board has taken no formal Board action adopting the

4   position that discharges from LRTC contribute to a violation of a water quality standard or are a

5   significant contributor of pollutants to waters of the United States under 40 C.F.R. section

6   122.26(a)(1)(v)." Lee Decl. ¶¶ 8-10. The section of the C.F.R. that Ms. Lee cites is the section of

7   the regulation, discussed above, that allows a Regional Administrator to exercise the residual

8   designated authority and require that a discharge that "contribute[s] to a violation of a water quality

9   standard" be covered by the Permit. While the initial letters that the Regional Board sent to

10  Defendants in March and May of 2013 indicate the staff's view that Defendants were required to

11  have site-wide Permit coverage, such informal communication is not an official expression of Board

12  policy.

13         Plaintiff's argument fails both because it has not established that staff members of the

14  Regional Board can informally exercise the residual authority in this manner, and because there is

15  undisputed evidence in the record that the Regional Board has specifically not taken a formal

16  position on the precise question at issue. Although Plaintiff claims that no formal designation is

17  required, it cannot escape the fact that its examples of the Board staff's exercise of the RDA, in the

18  March 18, 2013 and May 29, 2013 letters, are inconsistent both with each other (because the May

19  letter acknowledges that the Permit does not cover the coke piles, while the March letter insists that

20  the coke piles are covered by the Permit) and, more importantly, with Ms. Lee's declaration that the

21  Board has not taken formal action to designate any LRTC discharges under 40 C.F.R. §

22  122.26(a)(1)(v). There is no dispute that 33 U.S.C. § 1342(p)(2)(E) allows the EPA administrator or

23  the state to determine that the storm water discharge contributes to a violation of water quality

24  standards or is a significant contributor of pollutants to the waters of the United States, and that the

25  State of California empowers the Regional Water Boards to do so. But the Regional Board has

26  made no such determination here.

27

28              **c.      Deference to Agency Authority**

14

United States District Court
For the Northern District of California

The Court must consider whether the language in the statute, the Permit, and the regulations is so ambiguous that the court needs to look to the relevant agency's interpretation for guidance. See Chevron v. Natural Resources Defense Council, 467 U.S. 837, 842-43 (1984). On its face, the Permit does not regulate bulk handling and storage, which is the primary activity at the Levin Facility. However, there has been a great deal of confusion over the Permit coverage status of Defendants' activities, between the ambiguity of the checked boxes on the 1992 NOI form, the fact that Defendants have managed their storm water discharges in line with the Permit for many years, and the various statements of the Regional Board. That leaves the Court with the question of where to find the agency's interpretation. Is it the Regional Board's March 18, 2013 letter? The May 29, 2013 letter? The June 11, 2013 Notice of Violation? The Lee Declaration from July 16, 2013? As discussed above, these documents are not consistent with one another and the position appears to have evolved over time. The current position, reflected in the Lee Declaration, is that the Board "has taken no formal action adopting the position" that "LRTC must continue to have Permit coverage for activities that are not subject to the General permit" and "that discharges from LRTC contribute to a violation of a water quality standard or are a significant contributor of pollutants to waters of the United States." Lee Decl. ¶¶ 8-10. In other words, the Regional Board has no official interpretation to which the Court should defer.

Plaintiff argues, nonetheless, that under Chevron, the Court should defer to the Regional Board's position that storm water discharges associated with all activities, including bulk handling and storage, are regulated by the General Permit, because that interpretation is reasonable. See Chevron U.S.A. Inc. v. Nat. Res. Def. Council, 467 U.S. 837, 842-43 (1984). An agency's interpretation is reasonable where it furthers the purpose of the authorizing statute, is a permissible reading of the regulation, and is consistent with prior agency decisions, rather than a post hoc justification. Decker v. Northwest Envtl. Def. Ctr., 133 S. Ct. 1326, 1337-38 (2013). Plaintiff also cites Auer v. Robbins, 519 U.S. 452, 462 (1997) to support its position that courts should defer to informal, non-regulatory materials. In Auer, the Secretary of Labor's interpretation of a regulation arose in the form of a legal brief, rather than a formal regulatory interpretation. Id. The Supreme Court held that the interpretation was still worthy of deference, as set forth in an amicus brief,

because there was "no reason to suspect that the interpretation does not reflect the agency's fair and considered judgment."  Id.

Plaintiff also cites <u>California Pub. Interest Research Grp. v. Shell Oil Co.</u>, 840 F. Supp. 712 (N.D. Cal. 1993) (Henderson, J.), where the issue was whether the defendant had violated the NPDES permit for discharging selenium in excess of a numeric standard set forth in an interim permit, when there was also a narrative standard.  The court deferred to the interpretation of the Executive Director of the Regional Board, who testified about the standard at issue in both a declaration and a deposition.  840 F. Supp. at 716-17.  The Director stated in his declaration, and subsequently reaffirmed his testimony, that the intent of the narrative standard was not to modify the numeric standard, but simply to explain it.  <u>Id.</u> at 716.  He stated that "'it is not necessary to prove a violation of any narrative standard in an enforcement action relating to selenium.'"  <u>Id.</u> at 716.  The court held that "the Water Board could not be clearer: Shell is in violation of the NPDES permit when it violates the 5.8 lbs/day standard . . .."  <u>Id.</u> at 717.  The defendant argued that the Water Board had not yet formally determined whether it had violated the narrative standard and would not exercise its enforcement authority until that determination was made, but the court stated that neither of those statements was inconsistent with the Director's testimony.  <u>Id.</u>

Defendants distinguish these cases, pointing out that in <u>Auer</u>, the EPA was interpreting its own regulation in an amicus brief, whereas here, the Regional Board staff was interpreting a federal regulation.  In <u>CalPIRG v. Shell</u>, Defendants argue, the Board's Executive Director, who has more authority than a staff member, was testifying about the interpretation of a permit drafted by that Regional Board itself, unlike the Permit at issue here.  More persuasive is that in both <u>Auer</u> and <u>CalPIRG</u> the interpretation deferred to was set forth in a brief or in declaration or deposition testimony supporting a brief, like the Lee Declaration, rather than the Regional Board staff's prior letters.  Moreover, the Lee Declaration is the most authoritative statement from the Regional Board as to its position (or lack thereof) regarding Defendants' permit coverage, and to the extent the Court defers to the agency's interpretation, it looks to the Lee Declaration.  The Declaration acknowledges that the Permit, on its face, does not require coverage for bulk handling and storage and states that the Board has taken no formal position on whether Defendants must have "Permit coverage for

1    activities that are not subject to the General Permit."  Lee Decl. ¶ 8.

2          In the absence of a Board position to the contrary, and in light of the language of the General

3    permit, the Court holds that Defendants are not required to have Permit Coverage for activities

4    beyond those specifically enumerated in the Permit:  equipment cleaning and vehicle maintenance

5    and storage.  The scope of what is included in those activities, and whether Plaintiff has properly

6    noticed its claims regarding those activities, is discussed below.

7

8

9          **B.      Notice**

10

11         The Clean Water Act requires a citizen plaintiff to provide 60 days notice of its intent to sue.

12   Defendants argue that Plaintiff's Notice Letter was insufficient and therefore that the Court does not

13   have subject matter jurisdiction over Plaintiff's claims.  Plaintiff maintains that its Notice Letter

14   complied with the CWA's formal requirements and includes more than enough detail to put

15   Defendants on notice of their claims.  The question of whether Plaintiff's letter provided sufficient

16   notice for the claims in the First Amended Complaint is only the first that the Court must address.

17   Over the course of the briefing on these cross motions for summary judgment, Plaintiff introduced

18   several new arguments about Defendants' activities at the Levin Facility.  Although its reply brief

19   maintains Plaintiff's argument that the 1992 NOI triggers sitewide Permit coverage, including

20   Defendants' bulk handling and storage activities, much of the reply focuses on the widespread

21   nature of Defendants' vehicle maintenance and equipment cleaning operation, Plaintiff's new

22   contention that Defendants' equipment constitutes "point sources" that require Permit coverage, and

23   its new allegation that virtually all of the storm water at the Levin Facility co-mingles with runoff

24   from the maintenance and cleaning operations, requiring Permit coverage.  The Court will consider

25   whether these arguments were sufficiently explored in Plaintiff's Notice Letter.

26

27         **1.      Citizen Enforcement of the Clean Water Act and Required Notice**

28

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

A citizen plaintiff may file an enforcement action under the Clean Water Act "sixty days after the plaintiff has given notice of the alleged violation to . . . any alleged violator of the standard, limitation, or order." 33 U.S.C. § 1365(b). The notice requirement is detailed in the CWA's implementing regulations, at 40 C.F.R. § 135.3. First, "[n]otice regarding an alleged violation of an effluent standard or limitation or of an order with respect thereto, shall include sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated." 40 C.F.R. § 135.3(a). Second, the notice must describe "the activity alleged to constitute a violation." Id. The location of the alleged violation and the person or persons responsible for the violation must be specified, as well as the date or dates of the violation. Id. Finally, the contact information of the person giving notice and that person's legal counsel, if any, must be included. 40 C.F.R. § 135.3(c)).

Courts have described three separate functions of the notice requirement. See Friends of Frederick Seig Grove #94 v. Sonoma County Water Agency, 124 F. Supp. 2d 1161, 1167 n.7 (N.D. Cal. 2000). First, the enforcement function: a notice letter alerts the relevant agencies to alleged violations, which allows them to consider an enforcement action. Second, the compliance function: detailed notice allows the purported violator to come into compliance voluntarily, rather than face a lawsuit or administrative enforcement action. Third, settlement: regulators, alleged violators, and concerned plaintiffs have an opportunity to discuss solutions. Id. The Supreme Court has held that the 60-day notice provision should be construed strictly and that it is a mandatory prerequisite to bringing suit. Hallstrom v. Tillamook County, 493 U.S. 20, 23-24, 26 (1989). The Hallstrom court rejected arguments that the notice requirement "should be given a flexible or pragmatic construction." Id. at 26-27. Where a notice letter fails to observe the formalities required by the Clean Water Act, the court lacks jurisdiction to hear the case. See Washington Trout v. McCain Foods, Inc., 45 F.3d 1351, 1355 (9th Cir. 1995).

Neither the regulation nor the Supreme Court has clearly established the specificity or level of detail that a notice letter must include. The regulation requires that the plaintiff provide enough information to permit the recipient to identify the dates of the violation, but does not specifically require the notice to contain those dates. See 40 C.F.R. § 135.5(a). Ideally, a plaintiff will identify a

precise date, but if not, the range of the dates should be "reasonably limited." California

Sportfishing Protection Alliance v. City of West Sacramento, 905 F. Supp. 792, 799 (E.D. Cal.

1995) (holding that dates of violation must be stated with some specificity and rejecting a notice

letter that alleged hundreds of violations in a five-year range as insufficiently specific). The Ninth

Circuit has held that plaintiffs are not required to "list every specific aspect or detail of every alleged

violation." Cmty. Ass'n for Restoration of the Environment v. Henry Bosma Dairy, 305 F.3d 943,

951 (9th Cir. 2002).  In Friends of Frederick Seig Grove, the court noted that:

> [A] plaintiff is not required to provide in the notice letter itself an exhaustive list of each and
> every violation and the corresponding dates.  Instead, a plaintiff must do what the CWA
> regulation requires: provide enough information for a defendant to identify the dates of
> claimed violations.  When the plaintiff has gathered the information supporting its suit from
> the defendant's own submissions to the relevant state agencies and cites those submissions in
> the notice letter, the plaintiff has satisfied the notice requirement, and a district court
> possesses subject matter jurisdiction over the case.

124 F. Supp. 2d at 1169.

### 2.      Notice Letter

Plaintiff argues that its Notice Letter more than met the requirements of the Clean Water Act.

It is approximately 20 pages long and quite detailed.  Prior to writing the letter, Plaintiff states, it

reviewed publicly available documents, including Defendants 2003 SWPPP, its M&RP, and Annual

Reports.  Koch Decl. ¶ 10.  Plaintiff also visually observed the Levin Facility, from the street and

from its boat.  Declaration of Ian Wren ISO Pl.'s MSJ ("Wren Decl.") ¶¶ 4-5.  Plaintiff notes that it

identified the specific permit limitations that Defendants violated (Discharge Prohibitions A(1) and

A(2), Effluent Limitations B(1) and B(3), and Receiving Water Limitations C(1) and C(2)).  Docket

No. 12 (FAC) at 48-58 and Ex. A.  The letter describes the activities at the Levin Facility: "bulk

material storage; vehicle maintenance; rail car maintenance and/or cleaning; and bulk material

handling," based on Plaintiff's review of Defendants' Permit documents (the June 2003 SWPPP, the

NOI from 1992, and various annual reports).  Id. at 46.  The letter details which activities happen in

each part of the Levin Facility and describes the storm water conveyance system and the discharge

locations, based primarily on Defendants' self-reported information.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    As to the dates of violation, the Notice Letter states that "discharge violations of the Permit

2 are identified in Attachment A and Attachment B.  These discharge violations are ongoing and will

3 continue each time contaminated storm water is discharged in violation of the Receiving Water

4 Limitations of the Permit."  FAC Ex. A. at 8-18.   In the sections identifying specific violations,

5 Plaintiff's letter states that the storm water discharges from the Levin Facility violate the conditions

6 of the General Permit "during and/or following every significant rain event."  See, e.g., id. at 9.

7 Attachment A shows storm water sampling results reported by Defendants that show exceedences of

8 EPA benchmarks or Water Quality Standards and identifying which Permit provision is violated.

9 Attachment B is a table listing the dates on which there was a significant rain event between

10 September 2007 and March of 2012.  Id. Exs. A, B.

11    The Notice Letter also identified pollutants discharged from the Levin Facility, information

12 Plaintiff says it obtained from Defendants' Annual Reports, as well as other documents.  Among

13 these pollutants are "heavy metals such as zinc, copper, lead, aluminum, iron; benzene; oil and

14 grease; fuel and fuel additives; total suspended solids ('TSS'); coolant, pH-affecting substances;

15 pesticides such as DDT, aldrin, dieldrin, and endrin; and fugitive and other dust, dirt, and debris."

16 Id. at 6.  The letter states that Defendants' "failure to properly address pollutant sources and

17 pollutants results in the exposure of pollutants associated with their industrial activities to

18 precipitation, and results in the discharge of polluted storm water from the Levin Facility into

19 Receiving Waters in violation of the Permit.  Id. at 6-7.

20    Defendants object strenuously to the Notice Letter, arguing that it "provides no coherent

21 information about the nature of the alleged violations, when or where the violations occurred or

22 what steps LRTC could take to avoid a lawsuit."  Defs.' MSJ Br. at 15.  For example, it points to

23 Plaintiff's citation of zinc levels that exceed Water Quality Standards ("WQS") on three dates in

24 2011. FAC Ex. A at 13.  Defendants argue that there is no numeric effluent limitation in the General

25 Permit, and furthermore, there is no allegation about where the zinc is coming from.  Without that

26 information, Defendants argue, they cannot take any meaningful remedial action.  Defendants claim

27 that because there are no dates specified other than dates of U.S. EPA benchmark exceedances and

28 violations of WQS, and the Permit does not include numeric limits, there are no actual permit

United States District Court
For the Northern District of California

1   violations for which any date is provided.  Therefore, Defendants argue, the Notice Letter is

2   inadequate on its face.

3       Defendants argue that many other notice cases, including <u>Friends of Frederick Seig Grove</u>,

4   involve non-storm water point source discharges.  <u>Friends of Frederick Seig Grove #94 v. Sonoma</u>

5   <u>County Water Agency</u>, 124 F. Supp. 2d 1161, 1162 (N.D. Cal. 2000).  The permits governing those

6   discharges <u>do</u> include effluent limits, unlike the General Permit at issue here.  Exceeding the effluent

7   limit in one of those permits is a per se violation, and self-monitoring requirements require

8   dischargers to identify and disclose those exceedances.  Defs.' Reply at 8.  This is not the case for

9   the General Permit.  Plaintiff acknowledges that an exceedance of WQS is not a per se General

10  Permit violation, but contends that such an exceedance shows that Defendants are not engaging in

11  Best Management Practices ("BMPs"), as required by the Permit.  Reply at 22 n.11.

12      Defendants also point to factual inaccuracies in the Notice Letter.  Contrary to the Notice

13  Letter, Defendants state that the monitoring data in its Annual Reports has indicated no evidence of

14  PCBs, MTBE, oil and grease, benzene, ethylbenzene, toluene, or nickel in storm water discharges in

15  the last five years.  Holland Decl. ¶ 18.  Since Plaintiff did not conduct independent monitoring of

16  the discharges prior to the notice letter, the only monitoring data referred to comes from Defendants'

17  Annual Reports.  There also appears to be a dispute about whether a concrete cap at the facility is

18  cracked, "which can result in the exposure of pollutants such as DDT."  FAC Ex. A at 12.

19  Defendants maintain that there is no crack or sign of erosion, and that EPA inspects the facility each

20  year and confirmed recently that the cap was sound.  Holland Decl. ¶ 20 ("There are no cracks and

21  signs of erosion in the concrete cap that covers the Superfund site.  Indeed, EPA has been inspecting

22  the facility every year and recently confirmed, in 2012, that the concrete cap was sound.").  The

23  EPA report that Plaintiff cites as its basis for including the cracked concrete cap states: "the integrity

24  of the upland cap was well-maintained, and the cap was in good condition with no erosion.

25  Although surface cracks were visible on the cap, it was indicated in the annual reports that they were

26  not indicative of stress fractures but most likely developed subsequent to the curing of freshly-

27  poured concrete.  They were noted to be insignificant and do not require repair."  Koch Decl. Ex. B

28  at 121.

United States District Court
For the Northern District of California

1    Another Notice Letter inaccuracy cited by Defendants is the allegation that Defendants clean

2    rail cars at the Levin Facility and have violated the Permit by failing to monitor its sampling

3    discharge for rail-car-associated chemicals.  FAC Ex. A at 10.  (Rail-car cleaning generates

4    significant amounts of toxic pollutants.  See 40 C.F.R. subch. N.)  According to Defendants, they

5    have never cleaned rail cars at the facility, and their counsel repeatedly informed Plaintiff that LRTC

6    did not clean rail cars after Plaintiff sent the Notice Letter but before it filed suit.  See Defs.' Reply

7    at 6.  Plaintiff included this allegation in the initial Complaint, but not in the First Amended

8    Complaint. See id.

9    The overarching accuracy issue appears to be rooted in Plaintiff's pre-Notice Letter

10   investigation, which Defendants maintain was inadequate.  Defendants argue that Plaintiff failed to

11   make a reasonable inquiry into or review publicly available information about the identify of

12   materials stored at the terminal, Defendants' own implemented Best Management Practices

13   ("BMPs"), and the location and dates of alleged permit violations.  The SWPPP must identify and

14   explain a discharger's BMPs.  See Permit, Koch Decl. Ex. E, at 17-21.  At the time it sent the Notice

15   Letter, Plaintiff had not reviewed Defendants' current SWPPP, but rather relied on the 2003

16   SWPPP, which was prepared more than 10 years ago.  Plf.'s Reply at 18.  Plaintiff initially made a

17   public records request in November of 2011 to the Regional Board, and received the 1992 NOI, the

18   2003 SWPPP, and some Annual Reports in November 22, 2011.  Koch Decl. ¶ 10.  Plaintiff filed the

19   Notice Letter on June 5, 2012.  On July 3, 2012 and in September of 2012, Plaintiff followed up

20   with another public records request to the Regional Board and received more up to date documents,

21   including Defendants' most recent SWPPP.  Plaintiff filed its initial Complaint on August 17, 2012,

22   apparently before it had reviewed the most recent SWPPP.  According to Defendants' counsel,

23   Catherine Johnson, she offered the SWPPP to Plaintiff before it filed the lawsuit.  See Declaration of

24   Catherine Johnson ISO Defs.' Reply ("Johnson Decl.") ¶ 2.

25   Defendants maintain that these inaccuracies and Plaintiff's reliance on outdated information

26   mean that Plaintiff has not made the "good-faith allegations" required by the Supreme Court for

27   proper notice under the Clean Water Act.  See Gwaltney v. Chesapeake Bay Found., 484 U.S. 49, 65

28   (1987).  They argue that Plaintiff's Notice Letter does not meet the purposes of the Clean Water Act:

United States District Court
For the Northern District of California

1    it does not help Defendants come into compliance, because there are so many purported violations

2    with no suggested remedy that they "render the letter virtually incomprehensible," and because a

3    letter full of "fictitious factual assertions" does not furnish the administrative agency with

4    meaningful information.  Defs.' MSJ at 18.

5         Plaintiff vigorously defends its Notice Letter, pointing out that it is largely based on

6    Defendants' own self-reporting.  In terms of the materials handled and stored at the facility, Plaintiff

7    contests Defendants' assertions of inaccuracy.  For example, while Defendants claim that no bauxite

8    has been stored at the Levin Facility since 2008, their 2010-2011 Annual Report lists bauxite as a

9    material handled there.  See Holland Decl. ¶ 16 ("LRTC has not handled bauxite at the LRTC

10   Facility since 2008"); Supp. Koch Decl. Ex. D, 2010-11 Annual Report, at 9 (listing bauxite).  While

11   it may be that the inclusion of bauxite in the Annual Report was mistaken, the Report is certainly a

12   legitimate, and relatively recent, source for Plaintiff's Notice letter.

13        Plaintiff similarly defends its inclusion of other pollutants in the Notice Letter, noting that

14   the June 2003 SWPPP includes Defendants' Hazardous Materials Business Plan as an appendix, and

15   lists waste oil, gasoline, diesel fuel, lubricating oils and grease, oxygen, liquid oxygen, acetylene,

16   mapp gas, and light alphatic naphtha as materials stored at the Levin Facility.  Koch Decl. Ex. I at

17   45-71.  Plaintiff argues that it appropriately extrapolated from the fact that Defendants' self-reported

18   industrial activities and the fact that the Levin Facility includes a five-acre Superfund site

19   contaminated by pesticides to use the phrases "including but not limited to" and "can carry" in its

20   lists of pollutants – these lists, Plaintiff asserts, "were meant to be instructive, not exact." Plf.'s

21   Reply at 19.

22        As to the dates of alleged violations and what exactly constitutes a violation, Plaintiff claims

23   that its position is more nuanced than Defendants describe.  The Notice Letter referenced specific

24   dates on which Defendants' storm water discharges exceeded EPA benchmarks and WQS.  Plaintiff

25   now states that these exceedances, while not per se violations of the General Permit, show that

26   Defendants have not implemented the BMPs that meet the Permit technology standards.  Plf.'s

27   Reply at 21-22 & n.11.  Plaintiff alleges that the Permit violations happen during and following

28   every rain event, and Exhibit B to the Notice Letter is every date in an approximately 5-year period

in which 0.1 inches or more of precipitation fell near the Levin Facility.  Plaintiff also argues that

Defendants' failure to comply with the SWPPP and M&RP requirements is ongoing, and puts

Defendants in a daily and continuous state of violation, citing Friends of Frederick Seig Grove #94,

124 F. Supp. 2d at 1168 ("[C]ourts have not required a plaintiff to list a specific date for a violation

that is premised on the alleged violator's failure to act.").

As to the rail car cleaning issue, Plaintiff states that its allegation was based on Defendants'

self-reported activity of vehicle maintenance, and that the 1992 NOI indicated that there were

"Subchapter N limits" (which are associated with rail car cleaning) applicable to the Levin Facility.

Koch Decl. Ex. G at 3.  Plaintiff maintains that its subsequent amendment of the complaint to excise

allegations regarding railcar cleaning simply show that the purpose of the 60-day notice period was

served.  Further to that point, Plaintiff notes that after receiving the Notice Letter, Defendants

revised their SWPPP and began implementing additional pollution control measures at the Levin

Facility.  See Southwest Marine, 236 F.3d at 997 (noting that a defendant's remedial actions taken

after receipt of a notice letter supported the adequacy of the notice).  Plaintiff defends its pre-Notice

Letter investigation, pointing out that the Clean Water Act does not require it to conduct extensive

discovery before sending a Notice Letter, but rather, review currently available information.  See

Nat'l Res. Def. Council v. Southwest Marine, 236 F.3d 985, 996-97 (9th Cir. 2000).  Plaintiff states

that it received the June 2003 SWPPP from the Regional Board in November of 2011 and based

many of its allegations on that document; when it learned of a more recent SWPPP, it requested a

copy from Defendants and then from the Regional Board.  Koch Decl. ¶ 17.

Although the Court has some reservations about Plaintiff's Notice Letter and its pre-filing

investigation, it concludes that for the claims that actually appear in the Notice Letter and the First

Amended Complaint (an issue to be discussed more below), the Notice Letter is adequate.  It is

undisputed that Plaintiff's letter does not fail in terms of the formalities on which several of the cited

cases base their rejection of notice letters (e.g., the plaintiffs' failure to notify the relevant agencies of

their intent to sue, in Hallstrom, 493 U.S. at 23-24, or the failure to provide the contact information

for the plaintiff organizations, in Washington Trout, 45 F.3d at 1352).  Although the Supreme Court

has stated that the notice requirement must be strictly construed, Hallstrom, 493 U.S. at 31, it did so

1    regarding these formalities and provided little guidance on the remaining content of the notice.  The

2    regulation requires "sufficient information to permit the recipient to identify the specific standard,

3    limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the

4    person or persons responsible for the alleged violation, the location of the alleged violation, [and] the

5    date or dates of such violation . . .."  40 C.F.R. § 135.3(a).

6         In <u>San Francisco BayKeeper v. Tosco Corp.</u>, 309 F.3d 1153 (9th Cir. 2002), the Ninth Circuit

7    reversed the district court's grant of summary judgment to the defendant, owners of a coke facility.

8    The court stated that the regulations required no more than reasonable specificity in the notice letter,

9    and that an allegation that coke spilled into the water "on each day of ship loading, even on days for

10   which BayKeeper did not provide specific dates, was sufficiently specific to fulfill its notice

11   obligation."  309 F.3d at 1158.  The court reasoned that because the defendant knew better than

12   BayKeeper the dates on which it loaded ships, "[g]iven the knowledge that Tosco already had,

13   BayKeeper's letter was specific enough to notify Tosco of the nature of the alleged violations, as well

14   as the likely dates of those violations."  The court also noted its earlier decision in <u>Bosma Dairy</u>,

15   discussed above, where a plaintiff added additional dates of similar violations to its complaint

16   following the notice letter, and stated that "BayKeeper can pursue claims for such violations on other

17   dates within the overall period specified in the letter."  <u>Id.</u> at 1159.

18        The <u>Tosco</u> court found that the closer question was whether BayKeeper could pursue its claim

19   that Tosco was responsible for illegal discharges "'on each day when the wind has been sufficiently

20   strong to blow coke from the piles into the slough,'" alleged violations for which BayKeeper had

21   provided no specific dates, just a general date range covered by its entire notice letter.  309 F.3d at

22   1159.  The court held that because the notice clearly identified the alleged violation (wind blowing

23   coke from uncovered piles into the water) and was specific enough to allow the defendant to correct

24   the problem (by covering or enclosing the coke piles) that notice was adequate even without specific

25   dates.  <u>Id.</u>

26        Here, the situation is a somewhat similar.  At issue are rainy days, rather than windy ones.

27   Plaintiff here has provided dates of significant rainfall, so it is even more specific than the notice

28   letter approved in <u>Tosco</u>.  In <u>WaterKeepers Northern California v. AG Indus. Mfg.</u>, 375 F.3d 913,

917-18 (9th Cir. 2004), the Ninth Circuit reversed a district court's holding that notice was insufficient regarding dates, where the plaintiff alleged that the defendant discharged contaminated storm water during every rain event over 0.1 inches (the same standard at issue here).  The WaterKeepers case also discusses the difference between the standards of proof for notice and for the merits of the claim, and states that the regulation requires an intent-to-sue letter to put a defendant on notice as to the violations to be alleged in the complaint.  375 F.3d at 918.  In terms of providing notice about dates of violation, Plaintiff's Notice Letter is adequate.

Some of the issues raised by Defendants go more to the merits than to notice.  For example, although there are some disputes about the specific chemicals alleged to have been discharged, which may point to an imperfect pre-filing investigation, Plaintiff's potential overinclusiveness does not mean that its notice is inadequate.  The Ninth Circuit has stated that the "key language in the notice regulation is the phrase 'sufficient information to permit the recipient to identify' the alleged violations and bring itself into compliance."  Community Ass'n for Restoration of the Environment v. Henry Bosma Dairy, 305 F.3d 943, 951 (9th Cir. 2002).  Although Defendants' complaints of inaccuracy may be borne out at a later stage of the case, whether bauxite or benzene appropriately appears on a long list of potential pollutants does not mean that Plaintiff's Notice Letter is inadequate, particularly when that information came from Defendants' own documents.

The Court agrees with Defendants that Plaintiff's reliance on outdated documents is concerning.  The onus is on Plaintiff to conduct an investigation into the available relevant materials.  It is unclear to the Court why the initial public records request to the Regional Board, in November of 2011, did not yield the most recent SWPPP and Annual Reports.  Plaintiff obtained the more recent documents from the same source after it sent the Notice Letter, and Defendants contend that Plaintiff knew about the more recent SWPPP before it filed suit.  However, neither the arguable over-inclusiveness nor the reliance on older documents is fatal to Plaintiff's Notice Letter.

The next question for the Court is precisely what activities are included in the Notice Letter.  Given the Court's decision that Defendants' bulk material handling and storage activities do not require Permit coverage, the issue of whether there was sufficient notice of Plaintiff's claims regarding the activities that indisputably require Permit coverage, vehicle maintenance and

United States District Court
For the Northern District of California

1  equipment cleaning, is highly important.  The same is true of Plaintiff's new arguments that pieces of

2  Defendants' equipment are "point sources" and that storm water runoff from Permit-covered areas

3  commingles with runoff from other areas.

4

5       **3.**      **Defendants' Vehicle Cleaning and Maintenance Operation, Commingling,**

6              **Point Source Discharges, and the Permit Shield**

7

8          Defendants argue that it is impossible to tell whether any of Plaintiff's allegations in the

9  Notice Letter relate specifically to vehicle maintenance and equipment cleaning, which are the

10  activities conducted at the Levin Facility that indisputably require Permit coverage.  40 C.F.R. §

11  122.26(b)(14)(viii).  Defendants complain that no equipment cleaning is identified in the Notice

12  Letter, other than the erroneous allegation of rail car cleaning, and that the Notice Letter similarly

13  fails to identify the location of any alleged violations relating to vehicle maintenance or equipment

14  cleaning, or the alleged dates of those violations except for every time it rains.

15          Plaintiff, in its reply, claims that any deficiency in the Notice Letter's detail relating to vehicle

16  maintenance and equipment cleaning is a result of Defendants' inadequate SWPPP, which does not

17  include written descriptions of all vehicle maintenance and equipment cleaning operations.  Supp

18  Koch Decl. Ex. E, at 33:23-34:4, 41:22-42:9; see also Southwest Marine, 236 F.3d at 997 ("Although

19  we require strict compliance with the CWA's notice requirement, we do not require citizen-plaintiffs

20  to refer to provisions of plans that do not exist.").  Further, Plaintiff argues, the violations related to

21  vehicle maintenance and equipment cleaning are of the same type as those described in greater detail

22  elsewhere in the Notice Letter.  Plaintiff notes that in Henry Bosma Dairy, the Ninth Circuit held that

23  where "in essence all of the alleged violations are a single violation that repeated over a span of

24  time," and where "the violations originated from the same source, were of the same nature, and were

25  easily identifiable," notice was adequate even for violations that were discovered after the notice

26  letter was sent and which were included in the complaint.  305 F.3d at 952-53.

27          However, in Henry Bosma Dairy, the violations were precisely the same, before and after the

28  notice letter:  cows from two dairies produced manure that ran into a single drainage ditch, Joint

**United States District Court**
For the Northern District of California

1    Drain 26.6.  The court stated that '[t]he violations originated from the same source, the CAFO

2    dairies, which deposited the same waste material, manure, into clearly identifiable navigable waters

3    of the U.S., J.D. 26.6."  305 F.3d at 952.  Here, by contrast, Plaintiff's allegations about storm water

4    discharges from many different materials and sources over a 42-acre facility are more diverse.

5    Plaintiff's Notice Letter must include sufficient detail as to all of its current claims and arguments to

6    inform Defendants what they are doing wrong and what corrective actions can be taken; Plaintiff may

7    not rely on mere assertions that violations specifically related to vehicle maintenance and equipment

8    cleaning are of the same general type as the violations Plaintiff alleged regarding bulk material

9    handling and storage.  See 40 C.F.R. § 135.3(a) (requiring that a notice letter must include sufficient

10   information for the alleged violator to identify the activity alleged to have caused a violation).

11           At the hearing, the Court noted that some issues seemed to have changed over the course of

12   the briefing and asked for the parties' arguments on the following new contentions: first, that when

13   storm water from a Permit-requiring area commingles with storm water from a non-Permit requiring

14   area, Permit coverage of the entire facility is required; and second, that under Ecological Rights

15   Foundation v. Pacific Gas & Electric, 713 F.3d 502 (9th Cir. 2013),  many of Defendants'

16   conveyances and pieces of equipment are point sources.  The Court will consider whether these

17   claims were, in fact, contained in the Notice Letter, as required by the statute.  First, the Court will

18   address the scope of Defendants' vehicle maintenance and equipment cleaning operations and

19   whether there was sufficient notice as to Plaintiff's claims regarding those operations.

20

21           **a.      Scope of Vehicle Maintenance and Equipment Cleaning at the**

22                    **Levin Facility**

23

24           Plaintiff argues that these activities occur throughout the entire Levin Facility and that the

25   nature of Defendants' operations requires that the entire Facility be covered by the Permit.

26   Defendants argue that the vehicle maintenance and equipment cleaning operations are discrete and

27   that Plaintiff is attempting to impose Permit requirements on Defendants' cargo operation, which is

28   not regulated by the Permit.

Plaintiff's description of Defendant's vehicle maintenance and equipment cleaning operation is quite detailed, and is based on two declarations of Ian Wren, a BayKeeper staff member who observed the Levin Facility, as well as Defendants' own information.  According to Plaintiff, Defendants have identified three designated maintenance areas: an equipment repair building, a lubrication area, and a locomotive repair area.  Koch Decl. Ex. S (2013 SWPPP) at 9, 17-18.  The Equipment Repair Building is enclosed, and the adjacent steam-cleaning containment area is covered.  Id. at 8.  The lube station is part of the Main Terminal; the entire area is paved except for piers along the Santa Fe Channel and Lauritzen Canal.  Id. at 18.  Rail cars are repaired over a concrete lined vault constructed for the purpose; the vault floor is covered with Trackman, which is hydrocarbon absorbent, to absorb drips and spills.  Id. at 17.  The Main Terminal has two fueling stations, and the cranes are fueled in situ via a mobile fueling unit.  Koch Decl. Ex. P (2008-09 M&RP); Ex. S at 16.

Some large equipment is maintained where it is located rather than being moved inside.  See Koch Decl. Ex. S at 16 ("Equipment that cannot be serviced indoors is serviced on paved areas with appropriate absorbent booms and oil spill containment.").  For example, the four large cranes in the Main Terminal are maintained in situ.  Supp. Koch Decl. Ex E (Holland Depo.) at 32.  Some equipment is brought to an equipment wash area adjacent to the maintenance area and hosed off or steam cleaned.  Id. at 35.  The Facility uses two mobile steam-cleaners and a mobile pressure washer.  Id. at 34, 39-40, 105-106.  Plaintiff alleges that it observed a mobile steam-cleaning unit deployed adjacent to a clamshell bucket storage area approximately 100 yards away from the equipment steam cleaning area.  Wren Decl. ¶ 19.

Plaintiff cites a recent EPA decision, In re San Pedro Forklift, Inc., CWA Appeal No. 12-02, Docket No. CWA-09-2009-0006, 2013 WL 1784788 (Envtl. App. Bd. April 22, 2013), to support its contention that vehicle maintenance and equipment cleaning operations at the Levin Facility are widespread and diffuse, requiring Permit coverage for the entire Facility.  In San Pedro Forklift, the Environmental Appeals Board reversed an ALJ's decision that the San Pedro Forklift facility was not regulated under 40 C.F.R. § 122.26(b)(14)(viii) as a transportation facility having a vehicle maintenance shop and/or equipment cleaning operations.  The Appeals Board stated that the ALJ defined "vehicle maintenance shop" and "equipment cleaning operations" too narrowly, contrary to

United States District Court
For the Northern District of California

1    the purpose and intent of the CWA and EPA's own interpretation of its regulations.  San Pedro

2    Forklift, 2013 WL 1784788, at 3.  The Board held that the term "vehicle maintenance shop" in the

3    storm water regulations refers to a "nontransient area or location that is designated for use for vehicle

4    maintenance or in which vehicle maintenance is conducted on a regular or repeated basis, including

5    intermittently or sporadically."  Id.  It held that the term "equipment cleaning operations" refers to

6    "cleaning of industrial equipment anywhere on a facility's site pursuant to a business process or

7    practice for equipment cleaning."  Id.  It rejected the EPA's view that evidence of any on-site vehicle

8    maintenance or equipment cleaning activities can, by itself, establish the required elements.  Id.

9         The Board discussed the regulation's history, noting that the size of a vehicle maintenance

10   shop and other characteristics, such as whether it is covered or uncovered, do not appear to matter;

11   storm water permits are required if any repairs, even minor ones, occur in designated areas.  Id. at 14.

12   Maintenance facilities frequently have outside areas where parts are stored and disposed of and where

13   oil, grease, solvents, and other materials may accumulate.  Id.  The Board noted that "[o]ne key

14   difference" between a vehicle maintenance shop and an equipment cleaning operation is that vehicle

15   maintenance must occur in a non-transient area, whereas equipment cleaning can occur at any

16   nontransient or transient location on the site "once it has been demonstrated that the facility has

17   established equipment cleaning operations."  Id. at 18.  The Board reiterated this point: "once the

18   Region has established there is a business process or practice related to equipment cleaning, any

19   incident of cleaning pursuant to that process or practice would be subject to the permitting

20   requirements of the storm water regulations."  Id.

21        Defendants do not appear to dispute Plaintiff's specific factual assertions about where vehicle

22   maintenance and equipment cleaning take place at the Levin Facility, although they do dispute

23   Plaintiff's characterization of such activities as occurring throughout the entire Levin Facility.  They

24   argue that Plaintiff is trying to accomplish here, at Defendants' individual marine terminal, what it

25   could not do more broadly through statewide regulation:  have the State Board agree that the Permit

26   regulates all areas of transportation facilities, not just vehicle maintenance and equipment cleaning.

27   See Defs.' RFN Ex. C at 12.  As discussed above, the State Board rejected Plaintiff's contention that

28   the Permit should cover all areas of transportation facilities because the authority to add additional

United States District Court
For the Northern District of California

1   categories of Permit coverage is limited to a formal designation process.  Id. Ex. D at Comment 1223.

2   However, Defendants do not address the San Pedro Forklift Board decision in either of their briefs.

3          As noted above, it is undisputed that Defendants' vehicle maintenance and equipment

4   cleaning operations require Permit coverage.  Plaintiff's notice as to violations relating to vehicle

5   maintenance and equipment cleaning was adequate.  As Defendants' counsel acknowledged at the

6   hearing, the precise extent of vehicle maintenance and equipment cleaning at Defendants' facility is

7   an issue of fact that cannot be resolved on summary judgment.

8

9                    **b.        Commingling of Discharges from Regulated and Unregulated**

10                              **Activity**

11

12         Whereas Plaintiff initially argued that Defendants' vehicle maintenance and equipment

13  cleaning operations occurred throughout the Levin Facility, requiring Permit coverage of the entire

14  facility, it now also maintains that discharges associated with the vehicle maintenance and equipment

15  cleaning operations commingle with discharges associated with bulk handling and storage, therefore

16  requiring Permit coverage of the entire Levin Facility.  Pl.'s Reply at 6.  Plaintiff claims that there is

17  a basis for its commingling argument in the Permit language and regulations.  Storm water discharges

18  from areas of a facility that are not "industrial" under EPA regulations are excluded from the Permit.

19  (The "industrial areas" of the Levin Facility are those involving vehicle maintenance and equipment

20  cleaning.)  However, Plaintiff argues that the Permit states that discharges from areas of a facility that

21  are not themselves "industrial" areas are excluded from the permit only as long as those discharges

22  are not mixed with discharges from regulated "industrial" areas.  Koch Decl. Ex. E at 79.  Paragraph

23  9 on the "Definitions" page states that

24         'Storm Water Associated with Industrial Activity' means the discharge from any conveyance
           which is used for collecting and conveying storm water and which is directly related to
25         manufacturing, processing, or raw materials storage areas at an industrial plant.  The term
           does not include discharges from facilities or activities excluded from the NPDES program.
26  Id.

27         Further down, the paragraph defines "material handling activities" to exclude "areas located

28  on plant lands separate from the plant's industrial activities, such as office buildings and

31

1   accompanying parking lots as long as the drainage from the excluded areas is not mixed with storm

2   water drained from the above described areas."  Koch Decl. Ex. E at 79.  Plaintiff claims that this

3   means that where storm water from "industrial" and non-industrial activities is commingled, the

4   Permit[1] requires compliance with its terms with respect to the activities where the storm water is

5   commingled.  Therefore, Plaintiff argues, since Defendants' vehicle maintenance and equipment

6   cleaning operations occur throughout the site, and discharges from those industrial activities mix with

7   other storm water from the site through ten discharge pipes and the wooden deck of the site, the

8   Permit regulates the entire Levin Facility.  Reply at 4, 6, see Koch Decl. Ex. S at 12-14; Supp. Koch

9   Decl. Ex. E at 21-24, 35-36; 38-40, 101, 123-124, 157-58.

10          Defendants strongly contest this interpretation of the Permit, and argue that this is just another

11  attempt by Plaintiff to circumvent the rule-making process, where it has been unsuccessful in

12  convincing the Regional and State Boards to require Permit coverage for all areas of transportation

13  facilities.  They note that the provision cited by Plaintiff applies to material handling activities that

14  are regulated by the General Permit – and material handling activities are not regulated at marine

15  terminals, where only vehicle maintenance and equipment cleaning require General Permit coverage.

16  In the definition cited by Plaintiff, Defendants note the second sentence: "The term does not include

17  discharges from facilities or activities excluded from the NDPES program."  Koch Decl. Ex. E at 79.

18  As for the "commingling" idea, the definition of "material handling activities" excludes parking lots

19  and office buildings that are separate from the plant's industrial activities, "as long as the drainage

20  from the excluded areas is not mixed with storm water drained from the above described areas."  Id.

21  Defendants argue that even assuming that commingled discharges are regulated, no logical reading

22  supports Plaintiff's leap to an interpretation that all activities at a marine terminal would be subject to

23  regulation based on commingled discharge.  Defendants further argue that adopting such a position

24  would punish it for taking voluntary steps to control pollution.  It claims that the "common discharge

25

26          [1] Although the EPA's Multi-Sector General Permit does not apply to California, it contains a
    similar, much clearer, restriction:  "Discharges that are not otherwise required to obtain NPDES permit
27  authorization but are commingled with discharges that are authorized under this permit" are on the list
    of allowable discharges regulated by the permit. Decl. of Caroline Koch ISO Pl.'s Reply ("Supp. Koch
28  Decl.") Ex. A at 1.

**United States District Court**
For the Northern District of California

1    areas and discharge points" pointed to by Plaintiff are the infrastructure Defendants installed,

2    voluntarily, to collect, screen, and filter storm water before it reaches the bay.  Defendants argue that

3    Plaintiff converts the BMPs Defendants have constructed to minimize discharge into the Bay into a

4    vehicle for liability.

5         Plaintiff's commingling argument appeared for the first time in its reply brief.  Before it

6    considers the merits of the argument, the Court must decide whether or not the commingling claim

7    was included in Plaintiff's Notice Letter.  See 40 C.F.R. § 135.3.  Plaintiff argued at the hearing that

8    its Notice Letter did include the commingling claim, because the letter specifically identified vehicle

9    maintenance as a source of pollution, and the discharges from the vehicle maintenance operation mix

10   with the discharges from the rest of the facility.  Plaintiff stated that the Notice Letter described the

11   loading and unloading of dry bulk materials, cleaning, equipment repair, and maintenance and

12   storage areas, and the uses for several different yards at the Levin Facility.  See Notice Letter (Docket

13   No. 12) at 45-47.   The Notice Letter also lists the discharge points at the facility and truck routes

14   entering and exiting the facility.  It states that:

15        industrial operations at the Levin Facility are conducted outdoors without adequate cover to
          prevent storm water exposure to pollutant sources or direct discharge of pollutants via air
16        deposition, and without secondary containment or other measures to prevent polluted storm
          water and/or other pollutants from discharging from the Levin Facility.
17

18   Id. at 46.  The Notice Letter also states that pollutants are tracked throughout the facility operations

19   area and accumulate in the parking lot and driveways, so that "trucks and vehicles leaving the Levin

20   Facility via staging areas and driveways are pollutant sources tracking sediment, dirt, oil and grease,

21   metal particles, and other pollutants off-site."  Id.

22        The Court asked, at the hearing, which claims in the First Amended Complaint covered the

23   commingling argument.  Plaintiff stated that the First, Fourth, and Fifth claims for violations of

24   effluent limitations encompassed its commingling argument.  These claims are, respectively,

25   violations of:  Discharge Prohibition (A)(2) (discharge of storm water containing levels of pollutants

26   that cause or threaten to cause pollution, contamination, or nuisance); Discharge Prohibition (A)(1)

27   (discharge of non-storm water via fugitive coke and dust from wind, conveyers, and trucks, and

28   stockpiles and material transport systems); and Receiving Water Limitation (C)(1) (discharge of

1   storm water containing levels of pollutants that adversely impact human health and/or the

2   environment exceeding water quality standards).

3          Plaintiff is correct that the Notice Letter includes lists of pollutants, discharge points, and

4   sources of pollution, and that the claims in the complaint relate to discharges of storm water and non-

5   storm water from the Levin Facility.  However, the claims are very general and focus much more on

6   the language of the discharge prohibitions than on the mechanism of action of the pollutant (apart

7   from (A)(1), which is specific to dust).  None of the claims is specific to commingling.  More

8   importantly, there is no mention in the Notice Letter of the word  "commingling" or the idea that

9   discharges from activities covered by the Permit (vehicle maintenance and equipment cleaning)  mix

10  with discharges from activities not covered by the Permit (bulk handling and storage), therefore

11  requiring Permit coverage.  This is understandable, as the Notice Letter asserts that the entire Levin

12  Facility requires Permit coverage regardless of the specific activities conducted there.  Having staked

13  out that assertion, Plaintiff's Notice Letter did not provide the required notice to Defendant of its

14  commingling theory.  The statute and regulations require that the notice include "sufficient

15  information to permit the recipient to identify the specific standard, limitation, or order alleged to

16  have been violated," "the activity alleged to constitute a violation," and the location of the alleged

17  violation and the person or persons responsible for it, as well as the dates of violation.  40 C.F.R. §

18  135.3.  Here, "the activity alleged to constitute a violation" – the commingling of discharges from

19  Permit-covered activities with those from activities where no Permit coverage is required – was not

20  mentioned in the Notice Letter.  A failure to comply with the statute's notice requirements means that

21  the Court lacks jurisdiction to hear the claim.  See Washington Trout v. McCain Foods, Inc., 45 F.3d

22  1351, 1355 (9th Cir. 1995).  Therefore, the court will not address the merits of Plaintiff's

23  commingling argument, and grants summary judgment to Defendants on that claim.

24

25          c.      Point Source Discharges

26

27          Plaintiff has another evolving argument, that pieces of Defendants' equipment constitute

28  "point sources" under the Clean Water Act.  The Clean Water Act defines a point source as "any

discernable, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). Point source discharges require either General Permit or individual Permit coverage. 40 C.F.R. § 122. Plaintiff's Third Cause of Action alleged that

> Defendants discharged and continue to discharge pollutants from the Levin Facility to Waters of the United States without NPDES Permit coverage, in violation of Clean Water Act section 301(a), 33 U.S.C. section 1311(a), each time fugitive coke and other dust, including but not limited to dust generated by wind, conveyers, and trucks, discharges from uncovered bulk material stockpiles and/or uncovered bulk material transport systems on the Levin Facility to a water of the United States from 6 June 2007 through the present.

FAC ¶ 232. It now appears that, faced with a recent Ninth Circuit case that set forth a narrow definition of a "point source," Plaintiff has shifted its arguments from fugitive dust to "direct point source discharges of pollutants from Defendants' equipment such as trucks, railcars, front loaders, conveyors, cranes, and clamshell buckets to waters of the United States." Reply at 13; see Eco. Rts. Fdn. v. Pac. Gas. & Elec. Co., 713 F.3d 502, 508-10 (9th Cir. 2013) (holding that utility poles are not "point sources" and categorizing point sources).

Plaintiff claims that Ecological Rights Foundation has clarified that the MPDES permit requirement applies to all discharges except a limited category of storm water discharges. Reply at 13, citing 713 F.3d at 511-14. This is a significant overstatement of the case, which states: "EPA requires NPDES permits for only certain categories of storm water discharges. The only category [the plaintiff] argues applies in this case is 'discharge[s] associated with industrial activity.'" 713 F.3d at 511. Plaintiff argues that Defendants' direct discharges of pollutants to the Bay are either prohibited non-storm water discharges violating the terms of the Permit or are unpermitted point source discharges to the waters of the United States, both of which are regulated by the Clean Water Act, even if the pollutants travel through the air, as they would if blown from trucks, railcars, and other equipment. Reply at 13.

In Ecological Rights Foundation, the Ninth Circuit classified point sources into three categories: 1) things the CWA specifically identifies as point sources; 2) things constructed for the express purpose of storing pollutants or moving them from one place to another; and 3) things no one disputed were point sources. 713 F.3d at 509-10. The court included examples of cases in each

**United States District Court**
For the Northern District of California

1   category in footnotes, citing a number of the cases cited by Plaintiff in its brief.  Id. nn.3-5 (citing,

2   among other cases, Peconic Baykeeper, Inc. v. Suffolk Cnty, 600 F.3d 180 (2d Cir. 2010), League of

3   Wilderness Defenders v. Forsgren, 309 F.3d 1181, 1185 (9th Cir. 2002)).  For category 2, the point

4   sources include: aerial pesticide sprayers, piled debris that collected storm water and channeled it into

5   a nearby stream; a manure spreader (as rolling stock); bulldozers and backhoes; human-made spoil

6   piles and sediment basis that channeled storm water; a mining operation's drainage system; aircraft

7   equipped with tanks spraying pesticide; a sluice box from a mine; and bulldozers and backhoes that

8   ripped up and redistributed the pollutant, a layer of soil.  Id. at 509 n.4.

9         Plaintiff argues that Defendants' railcars are rolling stock, a specifically enumerated point

10   source in Category 1 in the scheme of Ecological Rights Foundation.  Plaintiff argues that the rest of

11   Defendants' equipment – the trucks, front loaders, cranes, etc. –  falls under the second category or

12   things that were constructed for the express purpose of storing pollutants or moving them from one

13   place to another.  Backhoes and bulldozers have been considered point sources.  See Avoyelles

14   Sportsmen's League, Inc. v. Marsh, 715 F.2d 897, 922 (5th Cir. 1983) (holding that "bulldozers and

15   backhoes were 'point sources,' since they collected into windrows and piles material that may

16   ultimately have found its way back into the waters); Borden Ranch Partnership v. U.S. Army Corps

17   of Engineers, 261 F.3d 810, 815 (9th Cir. 2001) (observing that the definition of point source is

18   extremely broad and citing Avoyelles to support a holding that where bulldozers and tractors pulled

19   large metal prongs through the soil in a wetland, they constituted point sources).  Plaintiff also argues

20   that the wooden deck at the Levin Facility is a point source, because it is sloped to promote drainage

21   inland but allows pollutants to discharge into the water.  Supp. Koch Decl. Ex. E at 74.

22         Under the most recent Ninth Circuit law, at least some of Defendants' equipment appears to

23   constitute a point source under the second category of storing/conveying pollutants set forth in

24   Ecological Rights Foundation.  Defendants' railcars are a specifically enumerated point source under

25   the Clean Water Act. 33 U.S.C. § 1362(14).   Defendants do not address this point in their reply brief,

26   except to cite Alaska Community Action on Toxics v. Aurora Energy Servs., LLC, No. 09-255, 2013

27   U.S. Dist. LEXIS 57516 (D. Alaska Mar. 28, 2013).  The court there held that the discharge of coal

28   dust from stockpiles and equipment was not a point source discharge, because "point sources are not

**United States District Court**
For the Northern District of California

1    distinguished by the kind of pollution they create or by the activity causing the pollution, but rather

2    by whether the pollution reaches the water through a confined, discrete conveyance."  2013 U.S. Dist.

3    LEXIS at *47 (internal citations and quotations omitted).  The court went on to note that a

4    conveyance is a

> means of transport, or the act of taking or carrying something from one place to another.
> Consequently, the Seward Facility's coal piles, stacker-reclaimer, and railcar unloader, no
> matter how easily they are identified as the original sources of coal dust blown into the Bay,
> cannot by themselves constitute "point sources" where there is no "discernible, confided, and
> discrete conveyance" of the dust from those sources to the water.  To find otherwise would
> require the Court to ignore clear statutory language.

Id. at *47-48 (internal citations omitted). Defendants argue that the alleged discharges of dust from

their cranes, trucks, railcars, and other equipment are not point sources.  However persuasive that

reasoning may be, Alaska Community Action on Toxics is a District Court case, filed before

Ecological Rights Foundation, and is no longer good authority where it conflicts with that Ninth

Circuit case.

As with Plaintiff's other evolving argument regarding commingling, the Court must consider

whether Plaintiff's Notice Letter included enough information about point source discharges to

constitute proper notice under the statute.  At the hearing, Plaintiff's counsel cited various sections of

the Notice Letter, which states that "industrial operations at the Levin Facility are conducted outdoors

without adequate cover to prevent storm water exposure to pollutant sources or direct discharge of

pollutants via air deposition, and without secondary containment or other measures to prevent

polluted storm water and/or other pollutants from discharging from the Levin Facility."  Notice Letter

(Docket No. 12) at 46.  The Notice Letter also lists sources of pollutants, including vehicle and

equipment maintenance areas and "on-site material handling equipment such as conveyors, forklifts,

and trucks."  Id.  It further states that pollutants are tracked throughout the operations area and

accumulate in the parking lot and driveways, so that "trucks and vehicles leaving the Levin Facility

via staging areas and driveways are pollutant sources tracking sediment, dirt, oil and grease, metal

particles, and other pollutants off-site."  Id.  While this description was too generic to constitute

notice for Plaintiff's commingling argument, it is specific regarding equipment such as "conveyors,

forklifts, and trucks," items that the Ninth Circuit has included in its category of point sources

"constructed for the express purpose of storing pollutants or moving them from one place to another."

United States District Court
For the Northern District of California

730 F.3d at 509.  Accordingly, Plaintiff has met the statute's notice requirements as to this argument.

The Notice Letter must include "sufficient information to permit the recipient to identify the specific

standard, limitation, or order alleged to have been violated," "the activity alleged to constitute a

violation," and the location of the alleged violation and the person or persons responsible for it, as

well as the dates of violation.  40 C.F.R. § 135.3.  Unlike Plaintiff's commingling argument, its claim

that Defendants' equipment and vehicles were "pollutant sources" means that "the activity alleged to

constitute a violation" appears in the Notice Letter.  Notice Letter (Docket No. 12) at 46.  Plaintiff's

counsel noted at the hearing that the third claim in its First Amended Complaint mentions "dust

generated by wind, conveyers, and trucks," in addition to fugitive coke dust from bulk material

stockpiles; this mention of the specific pieces of equipment in the First Amended Complaint bolsters

Plaintiff's argument that it gave proper notice of its point source claims.  FAC ¶ 232.

The Court denies Defendants' motion for summary judgment as to notice for this claim.

### d.    The Permit Shield

Defendants argue that should the dust from its equipment and material piles constitute a point

source discharge, it is protected by the permit shield of the General Permit, 33 U.S.C. § 1342(k)

("Compliance with a permit issued pursuant to this section shall be deemed compliance" with various

other sections).  The permit shield protects the permit holder from strict liability for unauthorized

discharges as long as the discharge was adequately disclosed to the permitting authority and the

Permit does not expressly prohibit the discharges.  See Alaska Community Action, 2013 U.S. Dist.

Lexis 57516, at *20-22.  The leading permit shield case is Piney Run Preservation Ass'n v. County

Commissioners of Carroll County, 268 F.3d 255 (4th Cir. 2001), which held that the defense applies

"as long as (1) the permit holder complies with the express terms of the permit and with the Clean

Water Act's disclosure requirements and (2) the permit holder does not make a discharge of

pollutants that was not within the reasonable contemplation of the permitting authority at the time the

permit was granted."  268 F.3d at 259, see also Natural Resources Defense Council, Inc. v. County of

Los Angeles, 725 F.3d 1194, 1204 (9th Cir. 2013) (citing Piney Run's general discussion of the

permit shield).

Defendants argue that the General Permit does not expressly prohibit discharges from loading and unloading activities, and that it is undisputed that they disclosed to the permitting authority that material handling and storage activities occur at the site in the 1992 NOI and in the SWPPP.  See Holland Decl. Ex. A at 14-16, 18-19, 21, 24.  They argue that they are in compliance with the Permit for the regulated activities at the site.

Plaintiff argues that the Permit expressly prohibits non-storm water discharges except as provided in Special Condition (D)(1), which does not include any of Defendants' non-storm water discharges.  Koch Decl. Ex. E at 19, 21 (these exceptions  include fire hydrant flushing, potable water testing, atmospheric condensates, landscape watering, ground water, foundation or footing drainage, and sea water infiltration).  Plaintiff also notes that the Regional Board has cited discharges of coke as a violation of the Permit.  Supp. Koch Decl. Ex. B at 9 ("Runoff from coke pile is a prohibited nonstormwater discharge.").

The parties provided very little briefing on this argument, and it appears that there are significant disputes of fact as to whether Defendants are in compliance with the General Permit and therefore able to use the permit shield.  Therefore, the Court denies Defendants' summary judgment motion as to this claim.

**V.     Conclusion**

The Court grants summary adjudication to Defendant on the issue of whether the General Permit covers all of Defendants' activities.  The language of the Permit makes clear that it covers only discharges associated with "industrial activity," which for a marine transportation facility such as the Levin Facility, are vehicle maintenance and equipment cleaning operations.  See 33 U.S.C. § 1342(p)(1),(2); 40 C.F.R. § 122.26(b)(14).  Defendants' bulk material and handling operation does not require Permit coverage.

The Court grants summary adjudication to Plaintiff, and denies summary adjudication to Defendants, as to the adequacy of Plaintiff's Notice Letter, with the exception that the Court grants

1  summary adjudication to Defendant on the issue of notice as to Plaintiff's argument that discharges

2  from Permit-covered activities commingle with discharges from activities not covered by the Permit,

3  therefore triggering Permit coverage for all such discharges.  This argument did not appear in

4  Plaintiff's Notice Letter, and therefore the Court does not have jurisdiction to consider the claim.

5      The Court denies summary adjudication to Defendant on the issue of notice as to Plaintiff's

6  argument that some of Defendants' equipment may constitute "point sources," under the Clean Water

7  Act, and therefore require Permit Coverage.

8      The Court denies summary adjudication to Defendant on its use of the permit shield as an

9  affirmative defense.

10     The Court will hold a case management conference on February 11, 2014, at 10:00 a.m., to

11 discuss the progress of the case.

12     **IT IS SO ORDERED.**

13

Dated:  December 18, 2013

14                                         _____
                                          ELIZABETH D. LAPORTE
15                                        United States Chief Magistrate Judge

16

17

18

19

20

21

22

23

24

25

26

27

28