Daniel Cooper (Bar No. 153576)
Caroline Koch (Bar No. 266068)
LAWYERS FOR CLEAN WATER, INC.
1004-A O'Reilly Avenue
San Francisco, California 94129
Telephone: (415) 440-6520
Facsimile: (415) 440-4155
Email: daniel@lawyersforcleanwater.com
Email: caroline@lawyersforcleanwater.com

George Torgun (Bar No. 222085)
Sejal Choksi-Chugh (Bar No. 222093)
SAN FRANCISCO BAYKEEPER
785 Market Street, Suite 850
San Francisco, California 94103
Telephone: (415) 856-0444
Facsimile: (415) 856-0443
Email: george@baykeeper.org
Email: sejal@baykeeper.org

Attorneys for Plaintiff
SAN FRANCISCO BAYKEEPER

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| SAN FRANCISCO BAYKEEPER, a California non-profit corporation, <br><br> Plaintiff, <br><br> v. <br><br> LEVIN ENTERPRISES, INC., a California corporation; LEVIN-RICHMOND TERMINAL CORPORATION, a California corporation, <br><br> Defendants. | Case No.: 12-cv-04338-EDL <br><br> ~~[PROPOSED]~~ **CONSENT DECREE** <br><br> **(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*)** |

## CONSENT DECREE

The following Consent Decree is entered into by and between Plaintiff San Francisco Baykeeper ("Baykeeper"), and Defendants Levin Enterprises, Inc. ("LEI") and Levin-Richmond Terminal Corporation ("LRTC") (collectively "Defendants"). The entities entering into this Consent Decree are each an individual "Party" and collectively "Parties."

**WHEREAS**, Baykeeper is a 501(c)(3) non-profit public benefit corporation dedicated to, among other things, the protection and enhancement of the water quality of the San Francisco Bay;

**WHEREAS**, Defendant LRTC is a California corporation and operates a marine dry bulk cargo terminal located at 402 Wright Avenue, Richmond, California 94804 ("Main Terminal") and conducts associated activities at parcels identified as South Parr Yard and North Parr Yard (hereinafter collectively the "Facility"). Defendant LEI, a California corporation, owns the property on which the Main Terminal is located;

**WHEREAS,** on June 6, 2012, Baykeeper served Defendants with a Notice of Violation and Intent to File Suit ("Notice Letter") under the citizen suit provisions of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA") pursuant to 33 U.S.C. §§ 1365(a) and (b);

**WHEREAS**, on August 17, 2012, Baykeeper filed a complaint ("Complaint") against Defendants in the United States District Court, Northern District of California ("Court" or "Northern District") (Case No. 12-cv-04338-EDL);

**WHEREAS**, on October 19, 2012, Baykeeper filed an amended complaint against Defendants in the Northern District (hereinafter "Amended Complaint");

**WHEREAS**, on January 15, 2014, Baykeeper served Defendants with a Supplemental Notice of Violation and Intent to File Suit ("Supplemental Notice Letter");

**WHEREAS**, on March 18, 2014, Baykeeper filed a motion with the Northern District proposing to amend the Amended Complaint with a Second Amended Complaint ("Second Amended Complaint");

**WHEREAS**, the Notice Letter, Complaint, Amended Complaint, Supplemental Notice Letter, and Second Amended Complaint (collectively "Baykeeper Pleadings") allege that discharges from the

Facility violated and are in violation of the Clean Water Act and that Defendants have failed and continue to fail to comply with the State Water Resources Control Board, Water Quality Order No. 97-03-DWQ ("Storm Water Permit");

**WHEREAS,** Defendants deny that they have violated or are in violation of the Clean Water Act or the Storm Water Permit;

**WHEREAS,** the Storm Water Permit will terminate on July 1, 2015, and has been reissued as State Water Resources Control Board, Water Quality Order No. 2014-0057-DWQ ("New Storm Water Permit"), which will go into effect on July 1, 2015; and

**WHEREAS,** Baykeeper and Defendants agree that it is in the Parties' mutual interest to resolve the allegations in the Baykeeper Pleadings under the Clean Water Act, Storm Water Permit, or any reissued Storm Water Permit including the New Storm Water Permit, based on the facts or claims asserted in the Baykeeper Pleadings without further proceedings and without any admission of liability on the part of Defendants.

**NOW THEREFORE IT IS HEREBY STIPULATED BETWEEN THE PARTIES AND ORDERED AND DECREED BY THE COURT AS FOLLOWS:**

1. **Jurisdiction and Venue.** For the purpose of this Consent Decree, the Parties agree that: (a) the Court has jurisdiction over the subject matter of this action pursuant to Section 505(a)(1)(A) of the Clean Water Act, 33 U.S.C. § 1365(a)(1)(A); (b) venue is appropriate in the Northern District pursuant to Section 505(c)(1) of the Clean Water Act, 33 U.S.C. § 1365(c)(1); and (c) Baykeeper has standing to bring this action. This Court shall retain jurisdiction over this Consent Decree for a period of four years from the date of entry of the Consent Decree, and thereafter until any disputes are resolved consistent with Section 20 (Dispute Resolution).

2. **Review by the Court and the United States.** Baykeeper shall lodge this Consent Decree with the Court and provide it to the United States for review and comment pursuant to 33 U.S.C. Section 1365(c)(3) and 40 C.F.R. Section 135.5. If the United States or the Court comment on the Consent Decree, the Parties agree to meet and confer to discuss such comments for a period not to exceed sixty (60) days and attempt to modify the Consent Decree as necessary to obtain entry of the Consent Decree. If the Parties do not agree to modify the Consent Decree during the meet and confer

or if the Consent Decree is not otherwise entered by the Court within one hundred and eighty (180) days after submission, the Consent Decree shall be null and void, and the Parties shall retain all rights they had in this litigation before the lodging of the Consent Decree.

3.      **Duration of Consent Decree.**  This Consent Decree shall be effective on the date that this Consent Decree is entered by the Court ("Effective Date").  This Consent Decree will terminate on December 31, 2018, or four years from the Effective Date, whichever is later ("Termination Date").

4.      **Pollution Control Measures.**  Defendants shall develop and implement the measures identified in Appendix A ("Pollution Control Measures") to reduce storm water contamination and fugitive dust discharge.  The Parties acknowledge that some of the Pollution Control Measures have already been adopted by Defendants.  Defendants agree to continue to implement such Pollution Control Measures as provided in Appendix A.

5.      **Sampling of Designated Discharge Points.**  Defendants shall collect storm water samples from the discharge points identified in its 2014 Storm Water Pollution Prevention Plan ("SWPPP") as SW-1 through SW-7, SW-11, and SW-12 (collectively "Designated Discharge Points") for four rain events per year during the period October 1st through May 30th ("Wet Season").  Defendants shall analyze each sample collected from Designated Discharge Points for the "Pollutants," as referenced in Table 1 below, except as otherwise noted in this Consent Decree.  If there is no discharge from a particular Designated Discharge Point in a particular rain event, or if a Designated Discharge Point has been eliminated, no sample needs to be collected from that Designated Discharge Point.  Defendants will notify Baykeeper in writing within thirty (30) days after the elimination of a Designated Discharge Point.  Defendants may discharge storm water from any Designated Discharge Points in the event: (a) a storm exceeds the design storm as provided in Section 1(A)(iii) of Appendix A; or (b) an electrical outage occurs (other than an outage intentionally caused by Defendants); or (c) of a Force Majeure event as provided in Section 23 (Force Majeure).

6.      **Sampling of Additional Areas.**  Defendants shall sample sheet flow for three rain events per year during the Wet Season between the "track out prevention zones," as identified in Section 4(A)(i) of Appendix A, and the public right of way ("Additional Sampling Locations").  If there is insufficient sheet flow to collect a sample from an Additional Sampling Location, no sample

needs to be collected from that Additional Sampling Location for that particular rain event.  Samples collected from the Additional Sampling Locations shall be analyzed only for total suspended solids ("TSS") and shall be collected only during the first two Wet Seasons.  TSS and the "Numeric Target" for TSS in Table 1 are the only Pollutant and Numeric Target in Table 1 applicable to the Additional Sampling Locations.  "Numeric Target(s)" are identified in Table 1 for each Pollutant.

7.      **Sampling Analysis and Protocols.**  The following requirements shall apply to any samples collected by Defendants under this Consent Decree:

7.a.      Defendants shall send samples to a laboratory accredited by the State of California.

7.b.      Defendants shall direct the laboratory to use analytical methods adequate to detect the individual Pollutants to be analyzed as required by the Consent Decree at or below the values for Numeric Targets specified in Table 1.

7.c.      Defendants shall deliver all samples collected from the Facility to the laboratory within applicable holding times, except for pH, which shall be analyzed with field instruments.

7.d.      Defendants shall provide the complete certified laboratory results of all samples collected at the Facility pursuant to this Consent Decree to Baykeeper within ten (10) days of receiving the certified laboratory results.

8.      **Sampling Reduction.**  Defendants may discontinue analyzing samples collected pursuant to this Consent Decree for a particular Pollutant for any Designated Discharge Point, if the sample result for that Pollutant is below its applicable Numeric Target for four consecutive sampling events at that Designated Discharge Point, provided Defendants have collected and analyzed the samples consistent with the terms of this Consent Decree.

9.      **Visual Observations.**  During the life of this Consent Decree, Defendants shall conduct visual observations at all Designated Discharge Points, except SW-2 and SW-3, and the Additional Sampling Locations a minimum of once per month.  Defendants shall keep an on-site log of visual observations.

10.      **Response Plan.**  If Pollutants in samples collected from Designated Discharge Points

1  or Additional Sampling Locations as required by this Consent Decree exceed the applicable Numeric

2  Targets in Table 1 ("Numeric Targets"), then by August 15th following the Wet Season when such

3  samples were collected, Defendants shall submit a plan to Baykeeper to adopt "Additional Pollution

4  Control Measures" designed to reach the Numeric Targets, subject to the Annual Cap and Total Cap

5  defined in Section 10.1 ("Response Plan"). "Additional Pollution Control Measures" means new

6  technology or upgrades or replacement of existing equipment designed to reduce emissions or

7  discharges of Pollutants, such as, but not limited to, sweeper trucks, vacuums, retention tanks, new

8  conveyors, and modifications to Advanced Treatment beyond the use of polymers identified in the

9  Flocculant Test Plan referred to in Appendix A, and are capital expenses which exclude routine repairs

10 and maintenance. Advanced Treatment is defined in Section 1(A) in Appendix A. Where Advanced

11 Treatment has not yet been implemented at a particular Designated Discharge Point, a Response Plan

12 shall not be required.

13

14 **Table 1. Numeric Targets for Levin Facility Discharges**

| Pollutant | Target | Units |
|---|---|---|
| Total Suspended Solids | 75 | mg/L |
| Oil and grease | 15 | mg/L |
| pH | 6-9 | s.u. |
| Total Nickel | 74 | µg/L |
| Total Copper | 4.8 | µg/L |
| Total Zinc | 90 | µg/L |
| Total Lead | 210 | µg/L |
| Total Aluminum | 0.75 | mg/L |
| Total Iron | 1.0 | mg/L |

23  10.1.  **Response Plan Requirements.**  Each Response Plan submitted shall include at

24 a minimum: (a) the identification of the Pollutant(s) discharged in excess of the Numeric Target(s), (b)

25 an assessment of the possible source of each Pollutant exceedance, (c) the identification of Additional

26 Pollution Control Measures, which may include modifications to the Advanced Treatment, (d)

27 estimated costs for implementing the Additional Pollution Control Measures with supporting

28 documentation, and (e) time schedules for implementation of the proposed Additional Pollution

1  Control Measures.  Notwithstanding any other provision of this Consent Decree, Defendants shall not
2  be required to implement any Additional Pollution Control Measures that collectively cost more than
3  One Hundred Thousand Dollars ($100,000.00) per year ("Annual Cap") (a year for purposes of the
4  Annual Cap runs from July 1st to June 30th) or more than Four Hundred Thousand Dollars
5  ($400,000.00) over the life of this Consent Decree ("Total Cap").  Expenses incurred by Defendants
6  for Additional Pollution Control Measures that exceed the Annual Cap in any year will accrue and
7  count toward the Annual Cap in successive years.  The time schedule for implementation shall provide
8  that all Additional Pollution Control Measures identified in a Response Plan shall be implemented by
9  December 31st.  If the timeline cannot be achieved by December 31st due to circumstances beyond
10 Defendants' reasonable control, Defendants shall explain to Baykeeper why the timeline cannot be
11 met and provide a new timeline.  If a Response Plan is required under Section 10 and Defendants have
12 not met either the Annual Cap or Total Cap, Baykeeper may invoke dispute resolution as to the
13 adequacy of a Response Plan pursuant to Section 20 (Dispute Resolution).  Any Additional Pollution
14 Control Measures resulting from dispute resolution shall remain subject to the Annual Cap and Total
15 Cap.

16         10.2.  **Baykeeper Comments on Response Plan.**  Within thirty (30) days of receipt of
17 a Response Plan, Baykeeper shall provide comments on the Response Plan, if any, to Defendants.
18 Defendants shall in good faith consider incorporating Baykeeper's reasonable comments and/or
19 reasonable recommended Additional Pollution Control Measures into the Response Plan, and shall
20 have thirty (30) days from receipt of such comments to finalize the Response Plan.  Defendants shall
21 implement the Response Plan according to the time schedule set forth therein, and disputes regarding
22 the Response Plan subject to Section 20 (Dispute Resolution) shall not impact the undisputed schedule
23 for implementation of any Additional Pollution Control Measures set forth in the Response Plan.

24         10.3.  **Additions to SWPPP.**  Within ninety (90) days after the Response Plan is final,
25 Defendants shall revise their current SWPPP to include any Additional Pollution Control Measures
26 identified in the Response Plan.

27     11.    **Storm Water Pollution Prevention Plan and Monitoring and Reporting Plan.**  By
28 September 30, 2014, Defendants shall revise their SWPPP and Monitoring and Reporting Plan

("M&RP") to:

11.a.   Include the Pollution Control Measures identified in Appendix A that Defendants are implementing to control pollution at the Facility;

11.b.   Identify the individuals responsible for compliance with the Storm Water Permit including specifying which individual is responsible for what area of compliance (e.g., John Doe, collecting samples);

11.c.   Create a visual inspection checklist that must be used by trained Facility personnel when conducting the visual observations and monitoring of storm water required under the Storm Water Permit;

11.d.   Include an updated site map to reflect all implemented Pollution Control Measures identified in Appendix A; and

11.e.   Include the sampling and monitoring requirements for the Designated Discharge Points.

12.   **Comments on SWPPP and M&RP.** Defendants shall submit the revised SWPPP and M&RP to Baykeeper for comment as soon as completed but in any event no later than September 30, 2014. Baykeeper shall provide comments, if any, to Defendants within thirty (30) days of receipt of the SWPPP and the M&RP. Defendants shall in good faith consider incorporating Baykeeper's reasonable comments into the SWPPP and the M&RP as such comments relate to Defendants' compliance with the Consent Decree, and the Parties shall meet to discuss any comments that are not incorporated.

13.   **Employee Training.** Within thirty (30) days of the Effective Date, Defendants shall provide a copy to Baykeeper of the training program required under the Storm Water Permit. Defendants shall incorporate any reasonable comments provided by Baykeeper on the training program within thirty (30) days of receipt of Baykeeper's comments, provided that Defendants shall have sole responsibility for determining the adequacy of staffing. Training shall be provided on an annual basis to employees responsible for compliance with the Consent Decree, the Storm Water Permit, or any reissued Storm Water Permit including the New Storm Water Permit, and shall be repeated as necessary for new employees.

14.     **Technical Site Visits.**  Baykeeper and its representatives identified in Section 6 of Appendix B ("Baykeeper Representatives") may conduct up to one technical site visit during the Wet Season and one technical site visit between June 1st and September 30th ("Dry Season") for the first two years of this Consent Decree.  Thereafter, Baykeeper Representatives may conduct up to one technical site visit at the Facility for the remaining two years of this Consent Decree.  The technical site visits shall comply with the technical site visit requirements and provisions set forth in Appendix B.

15.     **Compliance Monitoring and Oversight.**  Defendants shall provide Seven Thousand and Five Hundred Dollars ($7,500.00) per year to Baykeeper for routine compliance oversight, for a total of Thirty Thousand Dollars ($30,000.00), unrelated to fees and costs that may be incurred pursuant to Section 20 (Dispute Resolution).  Defendants shall make the first annual payment of compliance monitoring and oversight funds within sixty (60) days of the Effective Date and each subsequent annual payment on August 15th, payable to "San Francisco Baykeeper" and delivered by certified mail or overnight delivery to: 785 Market Street Suite 850, San Francisco, CA 94103.

16.     **Annual Reporting.**  On August 15, 2015, and each year thereafter on August 15th, Defendants shall prepare and send to Baykeeper an Annual Report that includes: (a) records kept by Defendants to verify implementation of the Pollution Control Measures in Appendix A; (b) identification of Additional Pollution Control Measures (if any) that have been implemented or will be implemented and are not already discussed in a prior Annual Report or Response Plan for the immediately prior Wet Season; and (c) documentation of actual expenses incurred for such Additional Pollution Control Measures under the Response Plan for the immediately prior Wet Season.

17.     **Supplemental Environmental Project**.  To remediate perceived environmental harms resulting from the alleged non-compliance with the Storm Water Permit as alleged in the Baykeeper Pleadings, Defendants shall pay to the Rose Foundation for Communities and the Environment ("Rose Foundation") the total sum of Fifty Thousand ($50,000.00) ("the Mitigation Payment").  The Mitigation Payment shall be made within sixty (60) days of the Effective Date, and sent to The Rose Foundation, 6008 College Avenue, Suite 10, Oakland, CA 94618, attention Tim Little, via certified mail or overnight delivery.  Defendants shall concurrently provide Baykeeper with a copy of such payment.  Such payments shall be used by the Rose Foundation to fund a supplemental environmental

project that will benefit the San Francisco Bay.

18.     **Baykeeper's Fees and Costs**.  Defendants shall contribute to Baykeeper's litigation fees and costs incurred in this action by paying Baykeeper One Million One Hundred Seventy-Five Thousand ($1,175,000.00).  Such payment shall be made by check payable to "San Francisco Baykeeper" within thirty (30) days of the Effective Date, and delivered by certified mail or overnight delivery to: 785 Market Street Suite 850, San Francisco, CA 94103.

19.     **Stipulated Payment**.  For any breach of the provisions of this Consent Decree relating to a Response Plan when the Annual Cap or Total Cap has been met, or for any missed deadline in this Consent Decree, this Section shall be the exclusive remedy.  Defendants shall make a stipulated payment of One Thousand Dollars ($1,000.00) to Rose Foundation up to a cap of Six Thousand Dollars ($6,000.00) per year for a total cap of Twenty-Four Thousand Dollars ($24,000.00).  Any payments made under this provision shall be made to  The Rose Foundation, and mailed via certified mail or overnight delivery to 6008 College Avenue Suite 10, Oakland, CA 94618, attention Tim Little.  Defendants agree to make the stipulated payment within thirty (30) days of a missed deadline or other breach of the provisions of this Consent Decree relating to a Response Plan when the Annual Cap or Total Cap has been met, an  d to make the payment via overnight delivery or by certified mail.  Defendants shall provide Baykeeper with a copy of each such payment at the time it is made.  The Rose Foundation shall use such payments for the benefit of the San Francisco Bay.

20.     **Dispute Resolution.**  The dispute resolution procedures of this Section shall be the exclusive mechanism for resolving any disputes arising under this Consent Decree with the exception of the disputes addressed under Section 19 (Stipulated Payment).

20.1.   **Meet and Confer.**  To invoke dispute resolution, a Party must provide written notice to the other Party within thirty (30) days of the occurrence of the alleged breach of this Consent Decree and no later than thirty (30) days following the Termination Date.  The notice shall include all reasons the Party has for raising the disputed issue.  Within thirty (30) days of receiving written notification, the other Party shall provide a written response and the Parties shall thereafter meet and confer within ten (10) days of such response.  Failure of any party to fulfill this notification or response requirement shall constitute a waiver of the Party's right to dispute the issue.  If the Parties

cannot resolve a dispute, within thirty (30) days of either Party terminating the meet and confer negotiations, the Party that raised the dispute may file a motion with the Court to invoke the alternative dispute process as provided below.

20.2.   **Alternative Dispute Resolution.**  The Parties agree to participate in court-sponsored alternative dispute resolution with Magistrate Judge Beeler, or other agreed upon magistrate judge, within sixty (60) days of the end of the meet and confer process.  Thereafter, the party initiating the dispute resolution provision may invoke formal dispute resolution by filing a motion before the Court to enforce the Consent Decree.  The Parties agree to request an expedited hearing schedule on any motion.

20.3   **Dispute Resolution Litigation Costs and Fees.**  For any motion filed with the Court under this Section, the Court may award costs of litigation (including reasonable attorney and expert witness fees) to the prevailing party or substantially prevailing party as provided under the CWA at 33 U.S.C. Section 1365(d).

21.   **Release and Covenant Not to Sue Provisions.**

21.1.   **Related Parties.**  "Defendants' Related Parties" means any insurer, heir, executor, administrator, successor, successor-in-interest, affiliate, assignor, vendee, lessee, subsidiary, attorney, agent, employee, officer, director, member, manager, shareholder, partner, owner, or alter ego of any Party or any Related Party of Defendants.  Defendants' Related Parties shall include Richmond Pacific Railroad Corporation, a California corporation and wholly-owned subsidiary of LEI, and 799 Wright Avenue LLC, a California limited liability company of which LEI is the sole member.  "Baykeeper's Related Parties" means its officers, directors, employees, agents, attorneys of record, other representatives and Baykeeper's successors and assigns.

21.2.   **Baykeeper Release.**  Baykeeper, on behalf of itself and Baykeeper's Related Parties, irrevocably releases, discharges, and agrees not to sue each Defendant and all of Defendants' Related Parties from and for, and irrevocably waives all claims, including all claims for injunctive relief, penalties, fees (including fees of attorneys, experts, and others), costs, expenses or any other sum incurred or claimed, known or unknown, past or present, ascertained or unascertained, suspected or unsuspected, absolute, or contingent, based on the facts or claims

1  alleged in this matter, including, but not limited to, the facts or claims alleged in the Baykeeper

2  Pleadings related to any events alleged to have occurred on or before the Termination Date.

3  Without limiting the foregoing, Baykeeper represents on behalf of itself and Baykeeper's Related

4  Parties that this Consent Decree resolves all claims, including alleged violations of the CWA or the

5  Storm Water Permit associated with the Facility, that could have been made by Baykeeper against

6  Defendants or Defendants' Related Parties before the Effective Date.  Baykeeper, on behalf of itself

7  and Baykeeper's Related Parties, covenants not to sue Defendants or Defendants' Related Parties

8  for any actual, alleged, or continuing violations of the CWA, the Storm Water Permit, or any

9  reissued Storm Water Permit including the New Storm Water Permit, or alleged in the Baykeeper

10  Pleadings, alleged to have occurred at the Facility on or before the Termination Date; provided, this

11  Section does not limit any right by Baykeeper to enforce the provisions of this Consent Decree, and

12  any failure to comply with the Consent Decree by either Defendant, or its successors or assigns,

13  shall be subject to Section 19 (Stipulated Payment) or Section 20 (Dispute Resolution), as

14  applicable.

15  　　　　21.3.  **Enforceability of Release.**  Notwithstanding any other provision of this

16  Consent Decree to the contrary, in the event a court finds Section 21.2 or any provision thereof is

17  unenforceable, the Parties and their successors or assigns may invoke dispute resolution under

18  Section 20 up to thirty (30) days after the court finds such provision of this Consent Decree is

19  unenforceable.  The Court may, based on the specific facts of the case and the overall intent of the

20  Consent Decree, rescind or modify the Consent Decree.  Otherwise, this Consent Decree shall be in

21  full force and effect.

22  　　　　21.4.  **Defendants' Release.**  Each of Defendants on behalf of themselves and

23  Defendants' Related Parties, irrevocably releases, discharges, and agrees not to sue Baykeeper and

24  Baykeeper's Related Parties from and for, and irrevocably waive all claims, including all claims for

25  injunctive relief, penalties, fees (including fees of attorneys, experts, and others), costs, expenses or

26  any other sum incurred or claimed, known or unknown, past or present, ascertained or unascertained,

27  suspected or unsuspected, absolute, or contingent, based on the facts or claims asserted in this matter,

28  including, but not limited to, the facts or claims alleged in the Baykeeper Pleadings related to any

events alleged to have occurred on or before the Termination Date.  Without limiting the foregoing, Defendants represent on behalf of themselves and Defendants' Related Parties that this Consent Decree resolves all claims that could have been made by Defendants against Baykeeper or Baykeeper's Related Parties related to this matter before the Effective Date.

21.5.   **Civil Code Section 1542.**  To the extent the Court finds that California Civil Code Section 1542 applies to this Consent Decree, the Parties expressly waive any rights or benefits available to them under the provision of California Civil Code Section 1542, which provides as follows:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

22.   **No Admission of Liability.**  Neither this Consent Decree, the implementation of Pollution Control Measures or Additional Pollution Control Measures, nor any payment made or other act taken pursuant to the Consent Decree shall constitute or be construed as a finding, adjudication, admission, or acknowledgment of any fact, law, or liability, nor shall it be construed as an admission of violation of any law, rule, or regulation.  Defendants maintain and reserve all defenses they may have to any alleged violations that may be raised in the future.

23.   **Force Majeure.**  No Party shall be considered to be in default in the performance of any obligations under this Consent Decree precluded by an event of Force Majeure.  Force Majeure is any event beyond the reasonable control of the Parties, including, without limitation, any act of God, war, fire, earthquake, windstorm, flood or natural catastrophe, civil disturbance, vandalism, sabotage or terrorism, restraint by court order or public authority or agency, action or non-action by, or inability to obtain the necessary authorizations or approvals from any governmental agency.  Force Majeure shall not include normal inclement weather, economic hardship, or inability to pay.  Any Party seeking to rely upon this Section to excuse or postpone performance shall have the burden of establishing that it could not reasonably have avoided the Force Majeure event and that through the exercise of due diligence it has been unable to overcome the failure of performance.  The Parties shall exercise due diligence to resolve and remove any Force Majeure event.  Delay in compliance with a specific obligation under this Consent Decree due to Force Majeure as defined in this Section shall not excuse

1  or delay compliance with any or all other obligations required under this Consent Decree.

2       24.   **Construction.**  The language in all parts of this Consent Decree shall be construed

3  according to its plain and ordinary meaning, except as to those terms defined specifically herein.  The

4  term "Section" as used in this Consent Decree, includes all subsections within the Section, except

5  where a subsection is expressly referenced.

6       25.   **Choice of Law.**  The laws of the United States shall govern this Consent Decree,

7  except where state law is applicable under the laws of the United States, in which case California law

8  shall apply.

9       26.   **Severability.**  Except as otherwise expressly provided in this Consent Decree, in the

10  event that any provision, paragraph, Section, subsection, or sentence of this Consent Decree is held by

11  the Court to be unenforceable, the validity of the enforceable provisions shall be in full force and

12  effect.

13       27.   **Correspondence.**  Any correspondence pertaining to this Consent Decree shall be sent

14  by overnight mail or courier as follows:

15

16       <u>If to Baykeeper:</u>

17       Daniel Cooper
            daniel@lawyersforcleanwater.com

18       Caroline Koch
            caroline@lawyersforcleanwater.com

19       Lawyers for Clean Water, Inc.
         1004-A O'Reilly Avenue

20       San Francisco, California 94129

21       With copies to:

22       Sejal Choksi-Chugh
            sejal@bakeeper.org

23       San Francisco Baykeeper
         785 Market Street, Suite 850

24       San Francisco, California 94103

25

26       <u>If to Defendants:</u>

27       Larry Cirelli
            lcirelli@hansonbridgett.com

28       Catherine Johnson
            cjohnson@hansonbridgett.com

1

Sophia Belloli
    sbelloli@hansonbridgett.com
Hanson Bridgett LLP
425 Market Street, 26th Floor
San Francisco, California 94105

2

3

4

With copies to:

5

Gary Levin, CEO
Levin-Richmond Terminal Corporation
402 Wright Avenue
Richmond, California 94804

6

7

8

Gary Levin, CEO
Levin Enterprises, Inc.
112 Washington Avenue, #250
Richmond, California 94801

9

10

11

Notifications of communications shall be deemed submitted the next business day after having been

12

deposited with an overnight mail/delivery service.  Any change of address or addresses shall be

13

communicated in the manner described above for giving notices.  In addition, the Parties may agree to

14

transmit documents via e-mail.

15

28.   **Effect of Consent Decree.**  Except as provided herein, Baykeeper does not, by its

16

consent to this Consent Decree, warrant or aver in any manner that Defendants' compliance with this

17

Consent Decree will constitute or result in compliance with any Federal or State law or regulation.

18

Nothing in this Consent Decree shall be construed to affect, expand, or limit in any way the obligation

19

of Defendants to comply with all Federal, State, and local laws and regulations.

20

29.   **Counterparts.**  This Consent Decree may be executed in any number of counterparts,

21

all of which together shall constitute one original document.  E-mail of a PDF signature shall be

22

deemed to be originally executed counterparts of this Consent Decree.

23

30.   **Modification of the Consent Decree.**  This Consent Decree, and any provisions

24

herein, may not be changed, waived, discharged, or terminated unless by a written instrument, signed

25

by the Parties, and consistent with any applicable requirements under 40 C.F.R. Section 135.5.

26

31.   **Full Settlement.**  This Consent Decree constitutes a full and final settlement of this

27

matter.

28

32.   **Integration Clause.**  This is an integrated Consent Decree.  This Consent Decree, and

Appendices A through B, which are incorporated herein, are intended to be a full and complete statement of the terms of the agreement between the Parties and expressly supersedes any and all prior oral or written agreements, covenants, representations, and warranties (express or implied) concerning the subject matter of this Consent Decree.

33.   **Authority.**  The Parties certify that their undersigned representatives are fully authorized to enter into this Consent Decree, to execute it on behalf of the Parties, and to legally bind the Parties to its terms.

34.   **Enforceability.**  The Parties agree to be bound by this Consent Decree and not to contest its validity in any subsequent proceeding to implement or enforce its terms.

35.   **Compliance by Defendants.**  Compliance with this Consent Decree by any one Defendant shall be deemed compliance by both Defendants (or, where applicable, compliance by any Related Party).  All the rights, duties, and obligations contained in this Consent Decree shall inure to the benefit of and be binding upon the Parties herein, and their successors and assigns.

36.   **Document Retention and Destruction.**  From the Effective Date of this Consent Decree, any compact discs ("CDs") or electronic files produced by Defendants at any time and for any reason shall not be copied or disseminated to anyone outside of this litigation, and all CDs and all copies of CDs, shall be returned to Defendants within ten (10) days of the Effective Date.  Any documents, photographs, or videos ("Documents") produced to Baykeeper by Defendants at any time and for any reason shall not be disseminated to anyone outside of this litigation, and Baykeeper shall make good faith efforts to secure the custody of all physical copies of Documents, including sending a letter to Baykeeper's attorneys of record and Baykeeper's experts within twenty (20) days of the Effective Date requesting the return of such Documents and any copies of Documents.  These Documents shall be maintained by Baykeeper's Managing Attorney thereafter.  No later than the Termination Date, Baykeeper shall destroy all Documents.  Within ten (10) days of the Termination Date, Baykeeper shall provide written confirmation and supporting documentation of such destruction to Defendants.  Notwithstanding this Section, to the extent any Documents are filed with the United States or the Court to enter or enforce this Consent Decree consistent with the Stipulated Protective Order entered by the Court on June 6, 2013 ("Stipulated Protective Order"), or to the extent any

1   Documents were already filed with the Court or otherwise made public or lawfully disseminated to

2   anyone outside of this litigation prior to the Effective Date consistent with the Stipulated Protective

3   Order, these actions are not subject to this Section.  The Stipulated Protective Order remains in full

4   force and effect after the Effective Date.  Any breach of this Section shall be subject to Section 20

5   (Dispute Resolution), and the Court may award relief as appropriate for breach of this Consent Decree.

6       37.     **Termination of Permit.**  In the event any Defendant elects to terminate its coverage

7   under the Storm Water Permit, or any reissued Storm Water Permit including the New Storm Water

8   Permit, the Defendant shall provide Baykeeper with a copy of the proposed Notice of Termination

9   before submitting it to the San Francisco Bay Regional Water Quality Control Board.

10      38.     **Interest Payments.**  In the event of late payment of any of the sums due under Sections

11  15, 17, 18, or 19, Defendants shall pay five percent (5%) simple APR interest to the entity to which the

12  payment was due.  This interest shall accrue from the first day Baykeeper provides written notice of

13  the late payment to Defendants until the date Defendants tender payment.  All such payments whether

14  payable to Baykeeper or the Rose Foundation shall be delivered to the respective addresses identified

15  herein.

16      39.     **Dismissal of Claim.**  If there is no objection by the United States to this Consent

17  Decree pursuant to 33 U.S.C. Section 1365(c)(3) and 40 C.F.R. Section 135.5, the Parties shall: (a)

18  request the approval and entry of this Consent Decree in the exact form presented to the Court, and (b)

19  within ten (10) days of entry of the Consent Decree by the Court, stipulate to the dismissal of this

20  action with prejudice.  If the Court has any comments on the Consent Decree, Section 2 (Review by

21  the Court and the United States) shall apply.  Upon entry by the Court, this Consent Decree shall

22  constitute a final settlement of the Baykeeper Pleadings.

23      40.     **Rights of Non-Parties.**  Except for the rights and remedies provided for Defendants'

24  Related Parties and Baykeeper's Related Parties in Section 21, to the extent permitted by law, this

25  Consent Decree does not and is not intended to confer any rights or remedies upon any third parties.

26      41.     **Headings.**  The Section headings contained in this Consent Decree are for reference

27  purposes only and shall not affect in any way the meaning or interpretation of this Consent Decree.

28      IN WITNESS WHEREOF, the undersigned have executed this Consent Decree as of the date

first set forth below.

APPROVED AS TO CONTENT

Dated: _____ 2014          By: _____
                                         Sejal Choksi-Chugh, Program Director
                                         San Francisco Baykeeper

Dated: *8/13/* 2014                  By: _____
                                         Gary Levin, CEO
                                         Levin Enterprises Inc.

Dated: *8/13/* 2014                  By: _____
                                         Gary Levin, CEO
                                         Levin-Richmond Terminal Corporation

APPROVED AS TO FORM

Dated: *8/13/14* 2014                By: _____
                                         Drev Hunt
                                         Daniel Cooper
                                         Caroline Koch
                                         Lawyers for Clean Water, Inc.
                                         Attorneys for Plaintiff

Dated: *8/13/14* 2014                By: _____
                                         Lawrence Cirelli
                                         Catherine Johnson
                                         Sophia Belloli
                                         Hanson Bridgett, LLP
                                         Attorneys for Defendants

IT IS SO ORDERED:

Date: _____                 _____
                                     Honorable Elizabeth D. Laporte
                                     UNITED STATES MAGISTRATE JUDGE
                                     NORTHERN DISTRICT OF CALIFORNIA

[Proposed] Consent Decree                    18            Case No.: 12-cv-04338-EDL

1   first set forth below.

2   APPROVED AS TO CONTENT

3

4   Dated: 8/13 2014                    By: _____
                                            Sejal Choksi-Chugh, Program Director
5                                           San Francisco Baykeeper

6

7   Dated: _____ 2014               By: _____
                                            Gary Levin, CEO
8                                           Levin Enterprises Inc.

9

10  Dated: _____ 2014               By: _____
                                            Gary Levin, CEO
11                                          Levin-Richmond Terminal Corporation

12

13  APPROVED AS TO FORM

14

15  Dated: 8/13/14 2014                 By: _____
                                            Drev Hunt
16                                          Daniel Cooper
                                            Caroline Koch
17                                          Lawyers for Clean Water, Inc.
18                                          Attorneys for Plaintiff

19

20  Dated: _____ 2014               By: _____
                                            Lawrence Cirelli
21                                          Catherine Johnson
                                            Sophia Belloli
22                                          Hanson Bridgett, LLP
                                            Attorneys for Defendants
23

24  IT IS SO ORDERED:

25  Date: _October 2, 2014_             _____
                                        Honorable Elizabeth D. Laporte
26                                      UNITED STATES MAGISTRATE JUDGE
                                        NORTHERN DISTRICT OF CALIFORNIA
27

28

[Proposed] Consent Decree                    18              Case No.: 12-cv-04338-EDL

# APPENDIX A

**Pollution Control Measures**

1. **Advanced Treatment**

   A. Design Criteria

      i. Advanced Treatment means flocculation, solids settling, and sand filtration as provided in the Flocculant Test Plan (April 17, 2014, Weiss Associates). Advanced Treatment may be refined or changed by Defendants based on the results of the pilot study.

      ii. Defendants shall install Advanced Treatment control measures at five Designated Discharge Points: Main Terminal, three (3); North Parr Yard, one (1); South Parr Yard, one (1).

      iii. Advanced Treatment shall be designed to a flow through standard equivalent to treat runoff resulting from a rainfall intensity of at least two times the 85% storm event, or 0.2" per hour.

      iv. By October 1, 2016, Defendants shall reduce Designated Discharge Points through Advanced Treatment at the Main Terminal from seven (7) existing (SW-1 through SW-7) to three (3).

   B. Implementation Schedule

      i. Phase I: Complete installation of Advanced Treatment for the combined SW-1 and SW-2 catchments by October 1, 2015.

      ii. Phase II: Install Advanced Treatment at two (2) additional Designated Discharge Points by October 1, 2015.

      iii. Phase III: Install final Advanced Treatment at two (2) additional Designated Discharge Points by October 1, 2016.

      iv. Defendants shall determine the order of Advanced Treatment installation based on operational requirements and monitoring data.

2. **Site Sweeping Plan** (For immediate implementation unless otherwise noted.)

   A. Document Site Sweeping Plan in SWPPP and train operators accordingly.

   B. Utilize PM10-compliant sweepers.

   C. Sweep affected areas of the site at least two times per day during bulk product handling.

   D. Sweep portions of Wright Avenue and Fourth Street adjacent to the Facility boundary at

least one time per day during days of operation.

E. During transfer of bulk product from South Parr to Main Yard, sweep Wright Avenue and Fourth Street at least two times per day.

F. Document implementation of Site Sweeping Plan by recording sweeper hours of operation, operator's written logs, or other equivalent means.

G. Test a GPS-based system to document location, duration, and time of sweeping by October 1, 2014.

H. Test modifications to vacuum sweeper to add articulated vacuum hose for cleaning curbs and railroad tracks by October 1, 2014.

3. **Covered Conveyors**

A. All newly purchased conveyors will be equipped with covers and drip pans.

B. Continue program to retrofit existing conveyors with covers and drip pans.

    i. There are 10 conveyors with covers and drip pans that have been retrofitted or purchased new in the last 6 years. These are the most commonly used conveyors.

    ii. There are 10 conveyors that need retrofit for drip pans, covers or drip pans and covers. These conveyors will be retrofitted with drip pans and covers or removed from service by October 1, 2016.

    iii. There are 5 conveyors at the railroad dump building that have covers. No drip pans will be installed on these conveyors due to space limitations.

    iv. Purchase a second telescoping conveyor with cover, drip pan, conveyor misters, and retractable discharge chute by October 1, 2014.

4. **Tracking Control Measures**

A. Track Out Prevention Plan for U.S. Department of Transportation regulated vehicles draying cargo

    i. By October 1, 2014, establish "track out prevention zone" at the Main Terminal and the South Parr Yard ingress/egress. Track out prevention zones will consist of paved areas approximately 15 feet wide and 40 feet long. The length will allow for three full rotations of 44 inch-diameter tires.

    ii. Delineate the border of the track out prevention zone on the pavement using a six-inch strip of white paint.

    iii. Test and install rumble plates, grating, or other physical method(s) to remove solids from tires. The physical method will be installed in the center of the track out

prevention zone for approximately one tire rotation length and clear pavement before and after.

    iv.  While running trucks, sweep the track out prevention zone with PM10-compliant sweeper, vacuum, brooms, or wet spray, every five hours or every 50 trucks.

    v.  For any transfer of loaders and lift trucks between the Main Terminal and South Parr Yard, inspect and, if needed, wash tires and wheel-wells of loaders and lift trucks.

    vi.  Maintenance trucks and vans will be routed through the Track Out Prevention Zone as necessary to minimize tracking.

B.  Update the SWPPP to include the "Track Out Prevention Plan" and to document existing track out prevention measures:

    i.  Schedule and procedures for running PM10-compliant sweeper along Wright Avenue, North Parr Yard, South Parr Yard, and the Main Terminal.

    ii.  Presence and effectiveness of grating on the ramp for mobile truck unloader.

    iii.  Controlled access routes for normal truck loading/unloading at South Parr Yard, and Main Terminal.

C.  Rail car tracking controls for rail cars used to load or unload bulk cargo

    i.  Request that customers use single-door bottom dump rail cars as available.

    ii.  Test and implement modifications to the hopper building to reduce residue on rail cars by October 1, 2015, which may include:

        •  modifying the hopper pit configuration to prevent or reduce material accumulation;

        •  additional manual air blowing; and

        •  possible automatic air or high pressure water sprays.

    iii.  Update SWPPP to include any rail car tracking controls implemented based on the tested modifications to the hopper building described above and train operators accordingly.

    iv.  During days of operation, inspect railroad lines along Wright Avenue between the Facility and 8th Street daily and clean any bulk material present at least daily.

5.  **Deck and Loading**

A.  Deck Sealing

    i.  A-berth is the main working dock and is nearly completely covered with concrete and asphalt. For A-berth, Defendants will routinely inspect the A-berth area and seal

identified cracks.

    ii.  B-berth is a timber wharf. For B-berth, Defendants will:

        1.  Continue with efforts to seal seams between timbers.

        2.  For the inshore rail track, where bottom-dump hopper cars are occasionally stored, Defendants will seal the area between the tracks with a hard surface (e.g., asphalt or concrete) and will store the bottom-dump rail cars only on this area.

        3.  This work will be completed by October 1, 2016.

    iii.  At the perimeter of both A- and B-berths, Defendants will cover the existing utility trench using steel diamond plate sheeting at A-berth and marine-quality plywood at B-berth south from Bent 22 by October 1, 2015.

B.  Operational Controls: For both the A- and B-berths, Defendants will:

    i.  Load vessels from A-berth, where reasonable.

    ii.  Use telescoping conveyors with covers, drip pans and drop tubes for bulk cargo loading/unloading, where reasonable.

    iii.  When using a hydraulic bucket for bulk cargo loading/unloading, place a heavy duty tarpaulin or other comparable or superior cover:

        1.  Over the B-berth area beneath the bucket arm radius between the crane rails.

        2.  Across the space between the rail and ship.

    iv.  Defendants will reposition and maintain the tarpaulin or other cover, as needed, for the duration of bulk cargo loading/unloading.

    v.  Train employees and regularly inspect, clean, sweep during bulk cargo loading/unloading.

    vi.  Replace timbers as needed and close additional gaps where necessary.

    vii.  Use fan-powered water misters, as required, during all loading/unloading operations to minimize fugitive dust.

**6.  <u>Use telescoping conveyor with rules for wind speed</u>**

A.  Install weather station with alarm by December 31, 2014.

B.  Continuously monitor wind speed during ship loading/unloading operations.

C.  Wind speed trigger levels:

      i.  Wind speeds will be monitored on a rolling 30-minute average basis.

      ii.  When 30-minute average wind speed exceeds 20 miles per hour, Defendants' Supervisor will:

          1.  Be notified automatically via cell-phone text message;

          2.  Assess operations to evaluate dust and safety of operations; and

          3.  Adjust operations as needed to prevent or reduce dust.

      iii.  When 30-minute average wind speed exceeds 35 miles per hour, Defendants' Supervisor will immediately cease ship-loading operations until wind speeds fall below this 30-minute average maximum.

D.  Notification and shutdown speeds may be adjusted downward as experience is gained with the system.

## APPENDIX B

The Settling Parties agree that technical site visits pursuant to the Consent Decree shall be conducted as follows:

### Duration of Technical Site Visit

1. Baykeeper shall provide twenty-four (24) hours notice prior to the start of any wet weather site visit and forty-eight (48) hours prior to the start of any dry season site visit;

2. Baykeeper shall notice its visits to occur during business hours of 8:00 a.m. to 5:00 p.m. Monday through Friday, excluding holidays;

3. The Parties shall make good faith, reasonable efforts to schedule a time for Baykeeper's visit on the date noticed by Baykeeper.  If agreement cannot be reached, Defendants shall propose three dates within the next three weeks for Baykeeper to select from to schedule a site visit, providing 24 hours notice;

4. Baykeeper shall make reasonable efforts to minimize the time it takes to complete its visit; in no event shall a visit last longer than three (3) hours;

5. Baykeeper shall confirm with Defendants that it intends to proceed with the noticed visit via email twenty-four (24) hours prior to the noticed visit.

### Attendees and Safety Measures

6. When it notices the visit, Baykeeper shall provide Defendants the names of the individuals representing Baykeeper who will attend the noticed visit. The individuals who may attend the noticed visit may be any or all of the following individuals up to a maximum of four (4) persons:

    a. Ian Wren;

    b. Sejal Choksi-Chugh;

    c. George Torgun;

    d. Jason Flanders;

    e. Deb Self;

7.   Individuals attending Baykeeper's noticed visit shall bring a form of government issued identification with them to the visit;

8.   Individuals attending Baykeeper's noticed visit shall wear safety gear (hard hats, safety glasses and ear plugs) provided by Defendants, as needed;

9.   Individuals attending Baykeeper's noticed visit shall follow necessary safety and security protocols;

10.  Baykeeper's attendees shall be accompanied by Defendants' representatives during Baykeeper's noticed visit;

11.  Baykeeper's representatives shall be free to step away during the visit, at sufficient distance to be out of earshot but within view of Defendants' representatives, to have brief, private conversations.  Such breaks shall be included within the total duration allotted for the inspection as provided within this Appendix.

**Scope of Technical Site Visit**

12.  For safety reasons, Baykeeper's noticed visit shall include only reasonable inspection of outdoor areas of the Facility and may include viewing outdoor areas where cargo is conveyed, stored, and loaded as well as areas where vehicle maintenance and equipment cleaning are conducted;

13.  Baykeeper's noticed visit may include viewing the storm water collection system, including the sheet flow to drains, the collection system, and the outfall points;

14.  Baykeeper's noticed visit may include the taking of photographs and/or video;

15.  Any photos and/or videos taken by Baykeeper or its agents during Baykeeper's visit and those produced by Defendants shall be used for informational purposes only, shall be treated as confidential consistent with the Stipulated Protective Order entered by the Court on June 6, 2013, and shall be permanently destroyed upon termination of the Consent Decree pursuant to Section 36 of the Consent Decree;

16.  The Parties shall exchange any photographs and/or videos taken during Baykeeper's visit within five (5) days of the visit.

**Sampling During Technical Site Visit**

17.  Baykeeper may collect samples from bulk cargo and storm water collected in the interceptors and at the discharge points identified in the Facility's latest SWPPP;

18.  Baykeeper will split samples collected during the visit with Defendants, if Defendants so request;

19.  In any sampling during a visit, Baykeeper shall follow the procedures identified in the Sampling Analysis Plan and Quality Assurance Project Plan attached as Exhibit A to the Stipulation and Agreement Re: Initial Wet Weather Inspection; Order ("Sampling and QA Plan") (Dkt. 41);

20.  Baykeeper may collect storm water samples from no more than ten (10) locations and Baykeeper's testing of these samples shall be limited to the parameters listed in Table 1 of the Consent Decree;

21.  The Parties shall exchange lab results for samples collected during Baykeeper's site visits within ten (10) days of receipt of such results from the lab;

22.  Sample results shall be treated as confidential consistent with the Stipulated Protective Order entered by the Court on June 6, 2013;

23.  The Parties agree that only those activities identified in this Appendix shall occur during any site visit by Baykeeper or its agents.